[Civ. No. 14828. Fourth Dist., Div. One. June 18, 1976.]

MOBIL OIL CORPORATION et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
AIR POLLUTION CONTROL DISTRICT OF
SAN DIEGO COUNTY et al., Real Parties in Interest.

294

## Counsel

Procopio, Cory, Hargreaves & Savitch, Gerald M. Dawson, Robert G. Russell, Jr., McCutchen, Black, Verleger & Shea, Phillip K. Verleger, Robert K. Wrede, Betty-Jane Kirwan, James F. Vernon, Higgs, Fletcher & Mack, J. Stacey Sullivan, Jr., Harry L. Carter, George C. Bond and Donald C. Gearhart for Petitioners.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Nicholas C. Yost and C. Foster Knight, Deputy Attorneys General, Robert. G. Berrey, County Counsel, Donald C. Clark, Chief Assistant County Counsel, Robert C. Rice and William C. George, Deputy County Counsel, Walker & Gann and Russell W. Walker for Real Parties in Interest.

## Opinion

**COLOGNE, J.**—On October 2, 1975, Union Oil Company of California (Union) petitioned the superior court for mandamus relief under Code of Civil Procedure section 1094.5 after an adverse decision made September 25, 1975, by the Air Pollution Control District of San Diego County Hearing Board (Hearing Board). The action seeks (1) a declaration rules 61[1] and 63[2] of the district requiring the installation of

---

[1] See appendix A for the full text of rule 61, Storage of Volatile Organic Compounds, originally adopted in 1972.

[2] See appendixes B and C for the full text of rule 63, Volatile Organic Compound Loading Facilities, in its form as amended. The original rule was effective in 1972, and as revised March 29, 1974 (along with rule 61), gave companies with stations having gasoline (or any volatile organic compound) storage tanks having more than 550 gallon

vapor recovery systems in gasoline storage and loading operations, respectively, be declared unconstitutional as arbitrary and unreasonable rule-making, (2) a declaration the rules violate the federal Clean Air Act and the federal Occupational Health and Safety Act, (3) a declaration the rules attempt to regulate matters reserved to the state, and (4) an injunction against the enforcement of rules 61 and 63. In the alternative Union prays for an order requiring the Hearing Board to set aside its decision requiring installation of a secondary (vacuum assisted) system of vapor recovery as a condition of the variance extension the Hearing Board granted. On October 10, 1975, Mobil Oil Company (Mobil) filed a similar action for administrative mandamus, a declaration the rules are unconstitutional, a declaration the district has no authority to adopt rules 61 and 63, and an injunction, or in the alternative, an order directing the issuance of a variance to Mobil for one year without any conditions as to the installation of a secondary recovery system. A temporary restraining order was granted Mobil and Union preventing the enforcement of rules 61 and 63.

Hearing on the preliminary injunction in both cases was set for October 24, 1975, before Judge Jack R. Levitt who, at the hearing's close, invited the parties to submit additional points and authorities. On December 19, 1975, the court consolidated the cases[3] and set them for trial on February 9, 1976. The court made no order relative to the preliminary injunction. In view of this and the fact the parties have not expressed a concern about the immediate enforcement of rules 61 and 63 by the district, we assume the protection afforded by the temporary restraining order remains in effect and there is no urgency demanding immediate compliance.

On January 6, 1976, the parties met to determine the permissible scope of discovery. The parties agreed to schedule depositions subject to a ruling regarding the scope of discovery as defined by the court. On January 9 the Oil Companies served notice they intended to depose 14 persons including 3 who had not been previously mentioned. On January 14, 1976, the county filed a notice of motion to limit depositions and interrogatories. On January 16, 1976, hearing was held before Judge

capacity and a total output of 2,000 or more gallons per month (also includes reservoirs or containers with same capacity and output), which were installed or being installed as of June 30, 1972, until December 1, 1974, to bring their operation in compliance with the rule. The rule was revised effective July 2, 1975, to clarify the vapor collection capability to be required.

[3]The petitioners are sometimes referred to jointly as the Oil Companies.

Levitt pursuant to stipulation to consider the Oil Companies' petition for leave to amend, an order delimiting the scope of discovery and an order for continuance. On February 2 the court granted leave to amend the complaint, it denied the motion for continuance, and limited the scope of discovery in the following way:

"IT IS FURTHER ORDERED, discovery by all parties shall be limited as follows:

"1. The taking of the depositions or other discovery of Board of Supervisors member Dick Brown and member Jack Walsh, acting as ex officio member of the Air Pollution Control District of San Diego County Board of Directors on February 2, 1976 or any other date is prohibited.

"2. Discovery, whether by deposition, interrogatories, or otherwise, shall be limited to inquiries reasonably calculated to lead to evidence that was in existence on September 11, 1975, including facts within the knowledge of the Air Pollution Control District staff and the District's interpretations of Rules 61 and 63, if other than purely subjective i.e. not officially expressed; as further defined and limited by the following:

"(a) Such evidence which in the exercise of reasonable diligence could not have been produced at the hearing before the Air Pollution Control District of San Diego County Hearing Board; or

"(b) Such evidence which is claimed to have been improperly excluded at a hearing before the Air Pollution Control District Hearing Board; or

"(c) Such evidence which relates to the basis of a claim that evidence was improperly excluded at a hearing before the Air Pollution Control District of San Diego County Hearing Board.

"3. No inquiry shall be propounded, and no party or witness shall be required to answer or respond to any inquiry directed to any acts, data, reports, or other evidence done or compiled after September 11, 1975."

The Oil Companies assert the depositions must be extensive and will require six to nine months to complete. They contend the trial court abused its discretion in limiting the scope of the depositions as it did and in refusing to grant a continuance.

The Oil Companies petitioned this court for a stay of all proceedings in the court below, which was granted, and a peremptory writ of mandate to compel the discovery requested by the Oil Companies and at least a 90-day continuance.

Rule 61 of the district requires the collection and disposal of gasoline vapors which would otherwise escape from the gasoline storage tanks. In pertinent part it reads as follows:

"(a) A person shall not hold or store any volatile organic compound ... in any stationary tank, reservoir or other container ... unless such tank, reservoir or container is ... designed and equipped with one of the following vapor loss control devices or systems which is determined by the Air Pollution Control Officer to be adequate for control, properly installed, in good working order and properly used:

"(1) A pressure tank maintaining, at all times, working pressures sufficient to prevent vapor or gas loss to the atmosphere

"(2) A floating roof ....

"(3) A vapor collection and disposal system, consisting of a vapor gathering system capable of collecting the volatile organic compound vapors and gases, and a vapor disposal system as prescribed in Rule 63. ...

"(4) Other equipment of at least equal efficiency to the equipment specified in (1), (2) and (3) above, provided plans for such equipment are submitted to and approved by the Air Pollution Control Officer.

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   ."

Rule 63 of the district, as amended for an effective date of July 2, 1975, and in effect at the time of the Hearing Board's latest decision, is designed to recover and dispose of gasoline vapors which arise from loading gasoline from tank trucks into storage tanks at service stations and other gasoline dispensing facilities and from storage tanks into consumer's motor vehicle fuel tanks. In pertinent part it reads as follows:

"(a) A person shall not (1) load or allow the loading of volatile organic compounds ... from any loading facility into any tank truck or trailer ... unless such loading facility or such tanks ... are equipped

with a vapor collection and disposal system, properly installed, in good working order, and in operation. Loading shall be accomplished in such a manner that displaced vapor and air from all sources shall be vented only to a vapor disposal system through vapor paths from which hydrocarbon emissions do not exceed the following limits:

"(1) Except as provided in subparagraph (2) below, hydrocarbon emission concentration shall not exceed 0.1% by volume during fuel transfer operations at a distance of ½" from any point on the vapor path, exclusive of exhausts from vapor disposal units and emergency vapor releases through pressure relief valves necessary to meet other requirements of law.

"(2) Hydrocarbon emission concentration during vehicle fueling operations shall not exceed 0.9% by volume for 90% of the number vehicles fueled at a distance of ½" from the vehicle/vapor control nozzle interface.

"The term 'vapor path' as used in this rule refers to the path of vapor travel through the vapor collection and disposal system including all points between the vapor return opening in any fuel dispensing device, the storage tank fill pipe, and the point immediately inside the vapor disposal unit exhaust.

" 'Vapor disposal system' means a device or combination of devices into which vapors are passed before being vented to the atmosphere. Vapor disposal systems must employ either adsorption, absorption, condensation or other means having a minimum continuous recovery or disposal efficiency of 90 percent by weight of vapors entering the system (except during emergency vapor releases through automatic emergency pressure relief valves necessary to meet other requirements of law), providing that the specific applications of such systems are approved by the Air Pollution Control Officer. . . ."

The technical details of qualifying systems are discussed in considerable detail in the record before the Hearing Board but it is not material at this stage of the proceedings for us to understand or relate the method of operation of the various systems. Suffice it to say the regulations are designed to require a system which would collect substantially all vapors within the prescribed limits emitted from the storage and transfer of gasoline until its ultimate use. The identification of specific equipment which meets these requirements or which can test whether the vapor

recovery equipment meets the requirements presents a source of considerable difference of opinion at the hearing.

In October 1973 Mobil made application to construct vapor recovery systems at 109 service stations[4] within the district. The applications were for approval of a balance system[5] but did not include nozzle equipment. The applications were denied by the air pollution control officer because the balance systems did not meet rules 61 and 63 in that they did not plan for the control of vapors vented from the underground storage tanks or provide for capturing vapors displaced from vehicle loading. The Hearing Board affirmed the denial on the bases, among others, the system did not have a "minimum *continuous* recovery efficiency of 90 percent by weight" (italics added) as required by rule 63(a), and no nozzle equipment was included. The Hearing Board did find, however: "Due to conditions beyond the reasonable control of Mobil, including but not limited to, the safety and reliability concerns with the approved systems, the rapidly changing state of the technology in the area of vapor control, the past uncertainty in respect to Rules 61 and 63, and the impossibility of Mobil securing and installing vapor control equipment to meet the December 1, 1974 deadline imposed by Rules 61 and 63, requiring immediate compliance with Rules 61 and 63 would constitute an arbitrary and unreasonable taking of Mobil's property without a corresponding benefit in reducing air contaminants." In light of this finding the Hearing Board granted Mobil a variance effective September 12, 1974. This variance was allowed on several conditions, most important of which were that Mobil was to (1) begin installation of the balance system including appropriate nozzles, at the affected stations at a rate of at least five stations per week, until all stations had the system installed, not later than April 15, 1975, (2) advise the air pollution control officer of its progress toward compliance, and (3) make the system compatible with a secondary recovery system.[6] On

---

[4]The number was later reduced to 105 service stations.

[5]The "balance system" or "displacement system" simply provides for a vapor return line from the motor vehicle tanks to the storage tanks, and from the storage tanks to the tank truck so that as the gasoline is delivered the liquid product displaces the vapor in the tanks forcing it back to the space vacated by the liquid in the dispensing source. It is from this source the vapors may be transferred for ultimate disposal. The effectiveness of this system is dependent upon an air-tight system which prevents escape of the vapors.

[6]A secondary recovery system is basically the same as the balance system but with a vacuum assist mechanism for drawing in the vapors to prevent their escape. This suction of vapors into the system permits effective control of the vapors without airtight operation so long as the suction mechanism is sufficiently close to the opening from which the vapors may escape to allow effective capture. A secondary recovery system also contemplates ultimate disposal of the vapors.

March 13, 1975, Mobil filed a petition for modification of the variance seeking an extended effective date of compliance with the terms of the variance. The Hearing Board found Mobil was or would be in violation of the terms of rules 61 and 63; the balance systems then installed even if equipped with presently available nozzles (which do not fit tight enough to achieve compliance with the rules of the district) could not comply since there is no uniformity in the size of vehicle fill-neck openings; the system is not designed to be able to comply with vapor disposal requirements; there are several systems which are available and meet the demanded recovery and disposal specifications of the district though admittedly more expensive than Mobil's balance system; and because of the rapidly changing state of technology in this field and the time required to achieve testing Mobil should be given additional time in which to comply.[7] In its decision effective September 30, 1975, the Hearing Board granted Mobil 30 days (from Sept. 11, 1976) to apply to the district for authorities to construct secondary systems at 20 locations, 60 days to order the equipment for those stations, 120 days to complete the work, and 150 days to obtain permits to operate. With regard to the other stations, Mobil was given 120 days to make application for installation of the system, 150 days to order the equipment and 210 days to complete construction. Final approval was to be obtained and full compliance met by June 30, 1976.

In 1973 Union applied for permits to operate 73 gasoline facilities in the district. Its application did not include nozzles or otherwise purport to comply with the rules of the district and was denied. Union then appealed but later dismissed the appeal and was granted a variance. In November 1974 it received a variance providing terms substantially similar to Mobil's variance except as to compliance dates which have been amended from time-to-time. In its last decision, effective September 30, 1975, the Hearing Board made findings similar to those specified in Mobil. The variance was granted on the condition Union submit applications for 10 stations for authority to construct vapor control equipment within 30 days of September 10, 1975, order the equipment within 60 days, complete installation of the equipment within 120 days and obtain all permits to operate the equipment within 180 days. As to the remaining stations the time spread of 120, 150 and 210 days was

---

[7] The conditions considered in granting the amendment to the variance are detailed in the district's order, pages 3 to 6, attached to exhibit G to Mobil's petition to the superior court, also exhibit A in the petition in this court.

applied as in Mobil's variance and full compliance was required on or before June 10, 1976.

The Oil Companies then filed their respective complaints and petitions in the superior court and obtained temporary restraining orders to prevent enforcement of rules 61 and 63. The cases were consolidated as previously stated but no preliminary injunction was ever issued. Very extensive interrogatories were prepared and served on the district and the Attorney General. A "Notice of Taking Oral Depositions and Request to Produce Documents and Things" was given by the Oil Companies and called for the deposition of two county supervisors and twelve other individuals who appear to be district employees. A motion was then noticed and made for leave to amend the pleadings, delimiting discovery and for continuance of the order. The court granted leave to amend, made an order delimiting the scope of discovery and refused to grant a continuance (see above). It is from the order delimiting discovery and refusal to grant a continuance that Mobil and Union seek relief in this court.

■ Orders either compelling an interrogatory or sustaining an objection to an interrogatory are reviewable by extraordinary writ (*Greyhound Corp. v. Superior Court,* 56 Cal.2d 355, 368-369, fn. 1 [15 Cal.Rptr. 90, 364 P.2d 266]) but such writs will not be issued routinely or as a matter of course even where the trial court's order is erroneous (*Oceanside Union School Dist. v. Superior Court,* 58 Cal.2d 180, 185-186, fn. 4 [23 Cal.Rptr. 375, 373 P.2d 439]). Generally, the prerogative writ should only be used in discovery matters to review questions of first impression that are of general importance to the trial courts and to the profession. This is clearly the situation here. Discovery in an administrative mandamus proceeding is not well defined. The complexity of the subject matter of these rulings, the technical and ever changing nature of the technology involved in air pollution control and the fact other similar cases are already on file or will be before the court in the next few months provide a compelling reason for consideration of these issues by this court.

■ Discovery statutes vest a wide discretion in the trial court and exercise of that discretion will be disturbed on appeal only when it can be said there has been an abuse of discretion (*Pacific Tel. & Tel. Co. v. Superior Court,* 2 Cal.3d 161, 171 [84 Cal.Rptr. 718, 465 P.2d 854]). A liberal policy of relevancy in justifying discovery counsels against overturning a trial court's decision *granting* discovery (*Pacific Tel. & Tel.*

*Co.* v. *Superior Court, supra,* at p. 171), but the appellate court should not use the rule giving the trial court wide discretion to defeat the liberal policies of the statutes with respect to orders which limit or deny discovery. The Supreme Court in the *Pacific Telephone and Telegraph Company* case has given the broadest possible interpretation of relevance, namely, relevance of the subject matter, in defining the scope of discovery, stating: "Matters sought are properly discoverable if they will aid in a party's preparation for trial. [Citations.] In addition, because all issues and arguments that will come to light at trial often cannot be ascertained at a time when discovery is sought, courts may appropriately give the applicant substantial leeway, especially when the precise issues of the litigation of the governing legal standards are not clearly established [citation]; a decision of relevance for purposes of discovery is in no sense a determination of relevance for purposes of trial." (*Pacific Tel. & Tel. Co.* v. *Superior Court, supra,* 2 Cal.3d 161, 172-173.)

■ A distinction must be made, however, for discovery insofar as it may be used in an action for administrative mandamus (Code Civ. Proc., § 1094.5).[8] An order compelling discovery must rest on a showing that the discovery is reasonably calculated to lead to evidence admissible under section 1094.5, subdivision (d) (*City of Fairfield* v. *Superior Court,* 14 Cal.3d 768, 774-775, fn. 6 [122 Cal.Rptr. 543, 537 P.2d 375]; *State of California* v. *Superior Court* [*Veta*], 12 Cal.3d 237, 256, 257-258 [115 Cal.Rptr. 497, 524 P.2d 1281]).

In this connection it is well to bear in mind the nature of the trial in superior court insofar as it affects the use of evidence to be presented even though it has no bearing on the scope of discovery (*State of California* v. *Superior Court* [*Veta*], *supra,* 12 Cal.3d 237, 257). If the "order or decision of the agency substantially affects a fundamental vested right, the trial court, in determining under section 1094.5 whether there has been an abuse of discretion because the findings are not supported by the evidence, must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence. If, on the other hand, the order or decision does not substantially affect a fundamental vested right, the trial court's inquiry will be limited to a determination of whether . . . the findings are supported by substantial evidence in the light of the whole record." (*Strumsky* v. *San Diego County Employees Retirement Assn.,* 11

---

[8]Where used in this opinion section 1094.5 refers to the section in the Code of Civil Procedure.

Cal.3d 28, 32 [112 Cal.Rptr. 805, 520 P.2d 29].) ■ Case-by-case determinations dictate whether the "substantial evidence in light of the whole record" or "independent judgment on the evidence" test applies under section 1094.5, subdivision (c). (*Merrill* v. *Department of Motor Vehicles,* 71 Cal.2d 907, 915 [80 Cal.Rptr. 89, 458 P.2d 33].) In each case the court must decide whether a "fundamental vested right" has been substantially affected by the administrative agency's decision. In the absence of an independent judgment review by the judiciary, an agency's decision taking away such a right would result in the agency exercising power reserved to the judiciary in contravention of the separation of powers clause of the California Constitution.

"Fundamental vested rights," first declared in *Drummey* v. *State Bd. of Funeral Directors,* 13 Cal.2d 75, 85 [87 P.2d 848], modernized by *Bixby* v. *Pierno,* 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242], are defined as follows: "In determining whether the right is fundamental the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation." (*Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 144.)

Citing an earlier case (*Faulkner* v. *Cal. Toll Bridge Authority,* 40 Cal.2d 317, 328-330 [253 P.2d 659]) the *Bixby* court restated the prevailing view of "manifesting slighter sensitivity to the preservation of purely economic privileges" in "analyzing the fundamental nature of the right asserted" (*Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 145). *Strumsky* v. *San Diego County Employees Retirement Assn., supra,* 11 Cal.3d 28, amplifies the nature of the "impact in human terms" necessary to find a fundamental vested right. It held a widow's need for self-support and the income of a pension had a recognizable impact in human terms and was therefore fundamental and vested. ■ Here it appears the Oil Companies are asking us to determine they have a fundamental vested right to release gasoline vapors while dispensing fuel to their customers. How are we to answer the public, on the other hand, who assert a fundamental vested right to breathe clean air? If either exists, it must be the latter. We are not presented with the enforcement of a rule which effectively drives the Oil Companies out of business. At most it puts an economic burden on them increasing the cost of doing business. In weighing the relative importance to individuals in the life situation, it is manifest the Oil Companies' right to continue releasing gasoline vapors into the atmosphere is neither fundamental nor vested. The trial court will use an evidentiary rule of "substantial evidence in light of the whole record" and discovery will be limited accordingly.

■    Section 1094.5, subdivision (d), provides for the range of admissible evidence and reads as follows: "(d) Where the court finds that there is relevant evidence which, in the exercise of reasonable diligence, could not have been produced or which was improperly excluded at the hearing before respondent, it may enter judgment as provided in subdivision (e) of this section remanding the case to be reconsidered in the light of such evidence; or, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court may admit such evidence at the hearing on the writ without remanding the case."

Read in light of the determination that this is not a case where independent judgment is to be applied this section necessarily restricts the scope of discovery in obtaining evidence for introduction at trial (*City of Fairfield* v. *Superior Court, supra,* 14 Cal.3d 768, 775; *State of California* v. *Superior Court* [*Robins*], 16 Cal.App.3d 87, 94 [93 Cal.Rptr. 663]; and *Transcentury Properties, Inc.* v. *State of California,* 41 Cal.App.3d 835, 841-843 [116 Cal.Rptr. 487]). Evidence of acts, data, reports and other evidence *within the limits of section 1094.5, subdivision (d)* is admissible regardless of whether it deals with events which occur before or after the date of the hearing.[9] The essential element is a finding the evidence "could not have been produced *there* in the exercise of reasonable diligence." (Italics added; *Barkin* v. *Board of Optometry,* 269 Cal.App.2d 714, 719 [75 Cal.Rptr. 337].) In *State of California* v. *Superior Court* [*Robins*], *supra,* 16 Cal.App.3d 87, 94, the court places emphasis on the fact that the trial court's authority to admit relevant evidence not adduced at the administrative agency hearing is limited *only* to such evidence. Thus it was error for the trial court to limit discovery to acts occurring before the date of the hearing rather than as provided in the code.

We will not attempt to rule on the propriety of each of the interrogatories propounded but by way of example we point out in a section 1094.5 proceeding if the evidence sought by way of discovery relates to a nozzle which could not have been produced at the time of the hearing because it had not been developed until after the hearing, the evidence is undoubtedly admissible and wide latitude should be afforded for discovery in this area. Nor do we suggest discovery should be limited to equipment which was developed after the time of the hearing where

---

[9]A detailed statement of circumstances permitting the parties to augment the record beyond the transcript of the agency's hearing is found in Deering, California Administrative Mandamus, pages 218 to 223, section 13.5 et seq.

there is a showing that in the exercise of due diligence the tests could not reasonably have been completed after the nozzle was developed and in time for the hearing.

Insofar as the order of the superior court seeks to preclude *all* inquiries relative to acts, data, reports or other evidence done or compiled after September 11, 1975, but otherwise meeting the standard of section 1094.5, subdivision (d), it unduly restricts the scope of discovery and to this extent the order must be modified.

The Oil Companies assert their demand for discovery is based on their complaint which attacks the constitutionality of the district's action in adopting the rules. The right to challenge the constitutionality of the regulation at the superior court level, even though the issue was not raised in the administrative hearing, is settled (*State of California* v. *Superior Court [Veta], supra,* 12 Cal.3d 237, 251). If the unconstitutionality is alleged to be "on its face" no additional evidence is necessary since the issue is purely a legal one of determining the validity of the act based on the language (*State of California* v. *Superior Court [Veta], supra,* at p. 256). The constitutionality of a statute, though valid on its face, may, however, be assailed by proof of facts showing no rational basis for the legislation (*United States* v. *Carolene Products Co.,* 304 U.S. 144, 153 [82 L.Ed. 1234, 1242, 58 S.Ct. 778, 784]). No discovery is required to establish this contention.

A challenge of the constitutionality of the act as it is applied to an individual under the facts of a particular case by an administrative board is essentially a review of the validity of the administrative action and as such is properly brought under the provisions of section 1094.5 rather than by means of a separate action for declaratory relief (*State of California* v. *Superior Court [Veta], supra,* 12 Cal.3d 237, 251; *Transcentury Properties, Inc.* v. *State of California, supra,* 41 Cal.App.3d 835, 842). Under the circumstances a challenge of the constitutionality of the statute either on its face or as applied to the facts would in no case call for the admission of evidence greater than allowed by section 1094.5, subdivision (d). Discovery would be limited accordingly.

The Oil Companies agree it is improper to inquire into the subjective mental processes and motivation of legislators, both state and local (*County of Los Angeles* v. *Superior Court [Burroughs],* 13 Cal.3d 721, 727 [119 Cal.Rptr. 631, 532 S.Ct. 495]). Interrogatories directed to the members of the Hearing Board are improper. To the extent interrogato-

ries are authorized under section 1094.5, we know of no authority denying the right of discovery directed to the staff of the district but this does not justify a probe of the mental processes of those persons in reaching official positions of their office (*Board of Administration* v. *Superior Court,* 50 Cal.App.3d 314, 323 [123 Cal.Rptr. 530]; see also *Transcentury Properties, Inc.* v. *State of California, supra,* 41 Cal.App.3d 835, 843; *State of California* v. *Superior Court [Robins], supra,* 16 Cal.App.3d 87, 94-95). The trial court limited discovery to "facts within the knowledge of the Air Pollution Control District staff and the District's interpretation of Rules 61 and 63 *if other than purely subjective i.e. not officially expressed.*" (Italics added.) While this language may be awkward, we understand it to embody the rule of discovery we have expressed and to this extent, this limitation is proper.

Let a writ of prohibition issue striking that portion of the order delimiting discovery to events occurring before September 11, 1975, and let a writ of mandate issue directing the trial court to allow a continuance of trial of the issues to a day at least 60 days after this opinion becomes final in order for the parties to complete discovery in accordance with the views expressed in this opinion. The stay order this court issued on February 6, 1976, is dissolved.

Brown (Gerald), P. J., and Ault, J., concurred.

Petitions for a rehearing were denied July 6 and 7, 1976, and the petitioners' applications for a hearing by the Supreme Court were denied September 8, 1976.

---

## APPENDIX A

RULE 61. STORAGE OF VOLATILE ORGANIC COMPOUNDS (revision effective 1/1/74).

(a) A person shall not hold or store any volatile organic compound having a vapor pressure of 1.5 pounds per square inch absolute or greater under actual storage conditions in any stationary tank, reservoir or other container of more than 550 gallons capacity or in any stationary tank, reservoir or other container having a total output of 2,000 gallons per month or more unless such tank, reservoir or container is used exclusively as a source of fuel for wind machines used for agricultural purposes or is designed and equipped with one of the following vapor loss control devices or systems which is determined by the Air Pollution Control Officer to be adequate for control, properly installed, in good working order and properly used:

(1) A pressure tank maintaining, at all times, working pressures sufficient to prevent vapor or gas loss to the atmosphere.

(2) A floating roof consisting of a pontoon type or double-deck type roof, or internal floating cover resting on the surface of liquid contents and equipped with a closure seal, or seals; to close the space between the roof edge and tank wall. (This control equipment is not appropriate if the volatile organic compound has a vapor pressure of 11 pounds per square inch absolute or greater under actual storage conditions.) All tank gauging and sampling devices shall be gas-tight except when gauging or sampling is taking place.

(3) A vapor collection and disposal system, consisting of a vapor gathering system capable of collecting the volatile organic compound vapors and gases, and a. vapor disposal system as prescribed in Rule 63. All tank gauging and sampling devices shall be gas-tight except when gauging or sampling is taking place, and a tank shall not be opened for gauging or sampling when the pressure in said tank is above atmospheric pressure.

(4) Other equipment of at least equal efficiency to the equipment specified in (1), (2) and (3) above, provided plans for such equipment are submitted to and approved by the Air Pollution Control Officer.

Tanks required by this rule may be equipped with automatic emergency pressure relief valves necessary to meet any other requirements of law.

(b) (Revision effective 3/29/74.) Notwithstanding subdivision (a) of this rule, a person holding or storing the above-specified compounds in a stationary tank, reservoir, or other container of more than 550 gallons capacity or having a total output of 2,000 gallons per month or more, which was either in existence on June 30, 1972 or in the process of being installed for use on said June 30, 1972 on the premises where they were to be used, shall not be subject to the provisions of subdivision (a) of this rule until December 1, 1974, provided, however, that such person is hereby required to (1) file on or before July 1, 1972 a compliance schedule with the Air Pollution Control Officer showing how the person will bring his operations into compliance with subdivision (a) of this rule on or before said December 1, 1974, and (2) obtain from the Air Pollution Control Officer before September 1, 1974 an Authority to Construct the required vapor loss control device or system. Failure to file such compliance schedule or abide by its terms shall render the prohibition contained in subdivision (a) of this rule immediately applicable to such person on July 1, 1972 or on the date of said person's failure to abide by said compliance schedule, and failure to obtain an Authority to Construct before September 1, 1974 shall render the prohibition contained in subdivision (a) of this rule immediately applicable to such person on September 1, 1974.

(c) Notwithstanding any other provision of these rules and regulations to the contrary, a person shall not hold or store any volatile organic compound having a vapor pressure of 1.5 pounds per square inch absolute or greater under actual storage conditions in any stationary tank, reservoir or other container which is located within 5,000 feet of another stationary tank, reservoir or other container owned or operated by said person and in use for holding or storing such volatile organic compounds, unless such tank, reservoir or container is used exclusively as a source of fuel for wind machines used for agricultural purposes or is designed and equipped with an approved vapor loss control device or system in accordance with subdivision (a) of this Rule 61; provided, however, that a person may store or hold gasoline in a maximum of two tanks, reservoirs or other containers within 5,000 feet of one another provided said tanks each have a capacity of 550 gallons or less and a total output of less than 2,000 gallons per month, and the gasoline in one tank has an octane rating higher than 95 and the gasoline in the other tank has an octane rating of 95 or less, and there is minimum difference in octane rating of at least 4 between the gasoline in the two tanks.

(d) The storage of perchloroethylene, 1, 1, 1, trichloroethane, propane and natural gas when not mixed with other volatile organic compounds having a vapor pressure of 1.5 pounds per square inch absolute or greater under actual storage conditions is exempt

from the provisions of this rule.

(e) (Effective 1/30/74.) Notwithstanding subdivision (a) of this rule, a person holding or storing the volatile organic compounds specified in said subdivision (a) in a stationary tank, reservoir or other container which was either in existence on June 30, 1972 or in the process of being installed on the premises where it was to be used on said June 30, 1972, shall not be subject to the provisions of subdivision (a) of this rule, provided that the total throughput of said tank, reservoir or other container does not exceed 2,000 gallons during any calendar month and said tank, reservoir or container is equipped to be loaded through a permanent submerged fill pipe. For the purposes of this subdivision (e), "submerged fill pipe" means any fill pipe which has its discharge opening entirely submerged when the liquid level is six inches above the bottom of the tank. "Submerged fill pipe" when applied to a tank which is loaded from the side means any fill pipe which has its discharge opening entirely submerged when the liquid level is 18 inches above the bottom of the tank.

## APPENDIX B

RULE 63. VOLATILE ORGANIC COMPOUND LOADING FACILITIES (revision effective 1/1/74).

(a) A person shall not (1) load or allow the loading of volatile organic compounds having a vapor pressure of 1.5 pounds per square inch absolute or greater, under actual storage conditions from any loading facility into any tank truck or trailer, railroad tank car, tanker, or stationary storage tank, except tanks used exclusively as a source of fuel for wind machines used for agricultural purposes with a capacity of more than 550 gallons or having a total input of 2,000 gallons per month or more, or (2) load or allow the loading of such compounds from any loading facility with a capacity of more than 550 gallons or having a total output of 2,000 gallons per month or more into any boat or motor vehicle or aircraft fuel tank having a capacity greater than 5 gallons, unless such loading facility or such tanks with a capacity of more than 550 gallons or having a total input or output of 2,000 gallons per month or more are equipped with a vapor collection and disposal system, properly installed, in good working order, and in operation. Loading shall be accomplished in such a manner that *all* displaced vapor and air from all sources will be vented only to the vapor disposal system. A means shall be provided to prevent drainage of the above-specified compounds from the loading device when it is removed from the loading point, or to accomplish complete drainage before such removal. No person shall intentionally spill any of the above-specified compounds.

"Vapor disposal system" means a device or combination of devices into which vapors are passed before being vented to the atmosphere. Vapor disposal systems must employ either adsorption, absorption, condensation or other means having a minimum continuous recovery efficiency of 90 percent by weight of vapors entering the system (except during emergency vapor releases through automatic emergency pressure relief valves necessary to meet other requirements of law), providing that the specific applications of such systems are approved by the Air Pollution Control Officer. Such systems must be in operation at all times during venting. Intermediate storage vessels may be used prior to disposal of vapors as prescribed above, provided they are so designed as to prevent release of vapors at any time during use.

(b) (Revision effective 3/29/74.) Notwithstanding subdivision (a) of this rule, a person loading or allowing the loading of the above-specified compounds in the above-specified storage vessels from the above-specified loading facilities, either of which were in existence on June 30, 1972 or in the process of being installed for use on said June 30, 1972, shall not be subject to the provisions of subdivision (a) of this rule until December 1, 1974, provided, however, that such person is hereby required to (1) file on or before July 1, 1972, a compliance schedule with the Air Pollution Control Officer showing how the person will bring his operation into compliance with subdivision (a) of this rule on or

before said December 1, 1974, and (2) obtain from the Air Pollution Control Officer before September 1, 1974 an Authority to Construct the required vapor collection and disposal system. Failure to file such compliance schedule or abide by its terms shall render the prohibition contained in subdivision (a) of this rule immediately applicable to such person on July 1, 1972 or on the date of said person's failure to abide by said compliance schedule, and failure to obtain an Authority to Construct before September 1, 1974 shall render the prohibition contained in subdivision (a) of this rule immediately applicable to such person on September 1, 1974.

(c) Notwithstanding subdivision (a) of this rule, a person loading or allowing the loading of the above-specified compounds into aircraft fuel tanks from loading facilities which were in existence on September 30, 1973 or in the process of being installed for use on said September 30, 1973, shall not be subject to the provisions of subdivision (a) of this rule until January 1, 1975 in respect to the loading or allowing the loading of such aircraft fuel tanks, provided, however, that such person is hereby required to file on or before October 1, 1973, a compliance schedule with the Air Pollution Control Officer showing how the person will bring his aircraft fuel tank loading operations into compliance with subdivision (a) of this rule on or before January 1, 1975. Failure to file such a compliance schedule or abide by its terms shall render the prohibition contained in subdivision (a) of this rule immediately applicable to such person on October 1, 1973 or on the date of said person's failure to abide by said compliance schedule.

(d) The loading of perchloroethylene, 1, 1, 1, trichloroethane, propane and natural gas when not mixed with other volatile organic compounds having a vapor pressure of 1.5 pounds per square inch absolute or greater under actual storage conditions is exempt from the provisions of this rule.

(e) (Effective 1/30/74.) Notwithstanding subdivision (a) of this rule, a person loading or allowing the loading of the volatile organic compounds specified in said subdivision (a) from a loading facility into a stationary storage tank or from a stationary storage tank into any boat or motor vehicle or aircraft fuel tank shall not be subject to subdivision (a) of this rule, provided that (1) the stationary storage tank was in existence on June 30, 1972 or in the process of being installed for use on said June 30, 1972, (2) the throughput of said stationary tank does not exceed 2,000 gallons during any calendar month, and (3) said stationary tank is equipped to be loaded through a permanent submerged fill pipe as defined in subdivision (e) of Rule 61.

## Appendix C

RULE 63. VOLATILE ORGANIC COMPOUND LOADING FACILITIES (revision effective 7/2/75).

(a) A person shall not (1) load or allow the loading of volatile organic compounds having a vapor pressure of 1.5 pounds per square inch absolute or greater, under actual storage conditions from any loading facility into any tank truck or trailer, railroad tank car, tanker, or stationary storage tank, except tanks used exclusively as a source of fuel for wind machines used for agricultural purposes with a capacity of more than 550 gallons or having a total input of 2,000 gallons per month or more, or (2) load or allow the loading of such compounds from any loading facility with a capacity of more than 550 gallons or having a total output of 2,000 gallons per month or more into any boat or motor vehicle or aircraft fuel tank having a capacity greater than 5 gallons, unless such loading facility or such tanks with a capacity of more than 550 gallons or having a total input or output of 2,000 gallons per month or more are equipped with a vapor collection and disposal system, properly installed, in good working order, and in operation. Loading shall be accomplished in such a manner that displaced vapor and air from all sources shall be vented only to a vapor disposal system through vapor paths from which hydrocarbon emissions do not exceed the following limits:

(1) Except as provided in subparagraph (2) below, hydrocarbon emission concentration shall not exceed 0.1% by volume during fuel transfer operations at a distance

of ½" from any point on the vapor path, exclusive of exhausts from vapor disposal units and emergency vapor releases through pressure relief valves necessary to meet other requirements of law.

(2) Hydrocarbon emission concentration during vehicle fueling operations shall not exceed 0.9% by volume for 90% of the number vehicles fueled at a distance of ½" from the vehicle/vapor control nozzle interface.

The term "vapor path" as used in this rule refers to the path of vapor travel through the vapor collection and disposal system including all points between the vapor return opening in any fuel dispensing device, the storage tank fill pipe, and the point immediately inside the vapor disposal unit exhaust.

A determination of whether a system meets the standards set forth in subparagraph (2) herein for 90% of the vehicles fueled shall be based on tests of that number of vehicles which the Air Pollution Control Officer determines is representative of the total vehicle population within the boundaries of the Air Pollution Control District. Where fuel transfer operations at a facility are limited to a type or types of vehicles, the Air Pollution Control Officer shall base such a determination on tests of that number of vehicles he determines is representative of the type or types of vehicles fueled at the facility.

A means shall be provided to prevent drainage of the above specified compounds from the loading device when it is removed from the loading point, or to accomplish complete drainage before such removal. No person shall intentionally spill any of the above-specified compounds.

"Vapor disposal system" means a device or combination of devices into which vapors are passed before being vented to the atmosphere. Vapor disposal systems must employ either adsorption, absorption, condensation or other means having a minimum continuous recovery or disposal efficiency of 90 percent by weight of vapors entering the system (except during emergency vapor releases through automatic emergency pressure relief valves necessary to meet other requirements of law), providing that the specific applications of such systems are approved by the Air Pollution Control Officer. Such systems must be in operation at all times during venting. Intermediate storage vessels may be used prior to disposal of vapors as prescribed above, provided they are so designed as to prevent release of vapors at any time during use.

(b) (Revision effective 3/29/74). Notwithstanding subdivision (a) of this rule, a person loading or allowing the loading of the above-specified compounds in the above-specified storage vessels from the above-specified loading facilities, either of which were in existence on June 30, 1972 or in the process of being installed for use on said June 30, 1972, shall not be subject to the provisions of subdivision (a) of this rule until December 1, 1974, provided, however, that such person is hereby required to (1) file on or before July 1, 1972, a compliance schedule with the Air Pollution Control Officer showing how the person will bring his operation into compliance with subdivision (a) of this rule on or before said December 1, 1974, and (2) obtain from the Air Pollution Control Officer before September 1, 1974 an Authority to Construct the required vapor collection and disposal system. Failure to file such compliance schedule or abide by its terms shall render the prohibition contained in subdivision (a) of this rule immediately applicable to such person on July 1, 1972 or on the date of said person's failure to abide by said compliance schedule, and failure to obtain an Authority to Construct before September 1, 1974 shall render the prohibition contained in subdivision (a) of this rule immediately applicable to such person on September 1, 1974.

(c) Notwithstanding subdivision (a) of this rule, a person loading or allowing the loading of the above-specified compounds into aircraft fuel tanks from loading facilities which were in existence on September 30, 1973 or in the process of being installed for use on said September 30, 1973, shall not be subject to the provisions of subdivision (a) of this rule until January 1, 1975 in respect to the loading or allowing the loading of such aircraft fuel tanks, provided, however, that such person is hereby required to file on or before October 1, 1973, a compliance schedule with the Air Pollution Control Officer showing how the person will bring his aircraft fuel tank loading operations into

compliance with subdivision (a) of this rule on or before January 1, 1975. Failure to file such a compliance schedule or abide by its terms shall render the prohibition contained in subdivision (a) of this rule immediately applicable to such person on October 1, 1973 or on the date of said person's failure to abide by said compliance schedule.

(d) The loading of perchloroethylene, 1,1,1, trichloroethane, propane and natural gas when not mixed with other volatile organic compounds having a vapor pressure of 1.5 pounds per square inch absolute or greater under actual storage conditions is exempt from the provisions of this rule.

(e) (Effective 1/30/74.) Notwithstanding subdivision (a) of this rule, a person loading or allowing the loading of the volatile organic compounds specified in said subdivision (a) from a loading facility into a stationary storage tank or from a stationary storage tank into any boat or motor vehicle or aircraft fuel tank shall not be subject to subdivision (a) of this rule, provided that (1) the stationary storage tank was in existence on June 30, 1972 or in the process of being installed for use on said June 30, 1972, (2) the throughput of said stationary tank does not exceed 2,000 gallons during any calendar month, and (3) said stationary tank is equipped to be loaded through a permanent submerged fill pipe as defined in subdivision (e) of Rule 61.