[Civ. No. 44602. First Dist., Div. Three. May 2, 1980.]

STANDARD OIL COMPANY OF CALIFORNIA,
Plaintiff and Respondent, v.
MILTON FELDSTEIN, as Air Pollution Control Officer, etc.,
Defendant and Appellant.

COUNSEL

John F. Powell, Richard W. Grieves, Thomas H. Crawford and Laurence G. Chaset for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Connett, Assistant Attorney General, Roderick E. Walston and David Nawi, Deputy Attorneys General, as Amici Curiae on behalf of Defendant and Appellant.

Pillsbury, Madison & Sutro, Noble K. Gregory, Harlan M. Richter and Michael H. Salinsky for Plaintiff and Respondent.

OPINION

FEINBERG, J.—

### The Procedural History

In 1973, the Bay Area Air Pollution Control District (District)[1] granted a permit to construct a low sulfur fuel oil facility (LSFO) to

---

[1] The name of the District was changed in 1978 to its present name—Bay Area Air Quality Management District. Its jurisdiction extends over some seven Bay Area counties and portions of two other counties.

Standard Oil Company of California (Standard) at its Richmond, California refinery[2] subject to certain conditions suggested by Standard and agreed to by the District.[3] Construction of the LSFO was completed in 1976 and Standard received from the District in August 1976 a permit to operate with a "shutdown" provision, i.e., the LSFO unit could operate *only* while two of the three preexisting units were out of operation.

Standard proceeded to operate with all four units. The District took the view that Standard by so doing was in violation of the permit. It initiated proceedings before the hearing board of the District (Hearing Board). The Hearing Board, in effect, ruled that Standard was in violation of the conditions of the permit to operate but authorized reinstatement of the permit at such time as Standard complied with the conditions upon which it had been first issued. The District did so reinstate the permit upon Standard's agreement to comply.

Standard then brought this action under Code of Civil Procedure section 1094.5 to declare the condition—unit No. 4 to operate only if two of the three preexisting units were down—null and void.

The trial court decided the case on the administrative record solely, and exercising its independent judgment thereon, granted the writ. This appeal followed.

This is the bare skeleton of the case; in the discussion that follows, we shall flesh out the bones.

---

[2]The refinery had three units refining crude oil at the time the permit to construct was sought. For convenience we shall refer to those units as the preexisting units; we shall refer to the LSFO unit variously as LSFO or as unit No. 4.

[3]The conditions suggested by Standard are as follows:

"a.  The Company will shut down two of the following three crude units while the *new crude unit* [No. 4] *is in operation:*

"1)  Residuum Stripper Vacuum Crude Unit

"2)  No. 11-1 Battery Crude Unit

"3)  No. 11-2 Battery Crude Unit

" . . . . . . . . . . . .

"d.  After startup of the new crude unit, we will limit operation of the above crude units as outlined in the foregoing *until* applicable California and Federal air standards are met in the vicinity of the Refinery, or *applicable District regulations are revised to make operation of such units permissible, or written approval for such operation is obtained from the BAAPCD* [Bay Area Air Pollution Control District] or the BAAPCD Hearing Board." (Italics added.)

## The Background

We start with the federal Air Quality Act of 1967, 81 Statutes at Large 485, as amended by the Clear Air Amendments of 1970, Public Law No. 91-604, 84 Statutes at Large 1676. The thrust of the law was to establish national quality minimum standards for the ambient air, i.e., the outdoor air we breathe. Achievement of the standards was left to the states which were required to prepare and enforce a state implementation plan, subject to the approval of the Environmental Protection Agency (EPA). If a state did not submit such a plan to the EPA within the time specified, the administrator of the EPA was required to promulgate and enforce such a plan on the delinquent state's behalf.

The purpose of the federal Clean Air Amendments of 1970 was to achieve national, effective air pollution control and "[e]ffective pollution control requires *both reduction of present pollution* and prevention of new significant pollution problems." (H.R. Rep. No. 91-1146, 1970 U.S. Code Cong. & Admin. News, pp. 5360-5361; italics added.)

In California the Legislature has created the State Air Resources Board with overall control of the effort to achieve ambient air quality standards (Health & Saf. Code, §§ 39002, 39003) but has given to local and regional bodies, such as the District here, "the primary responsibility for control of air pollution from all sources, other than emissions from motor vehicles" (*Id.*, § 40000) and these local districts are directed to "endeavor to achieve and maintain the federal ambient air quality standards" (*Id.*, § 40001). Districts have the power to adopt and enforce rules and regulations to achieve and maintain ambient air quality. (*Id.*, § 40001.)

Each District is directed to employ an air pollution control officer (Control Officer) whose duty it is to enforce the statewide provisions relative to the ambient air as well as the District's orders, rules and regulations. (*Id.*, §§ 40750, 40752.)

Pursuant to its authority, the District here promulgated regulation 2. Regulation 2 provided for a permit system to "construct any facility... or erect, alter, or replace" any "article, machine, [or] equipment" or to operate any of the foregoing if such operation would increase, eliminate,

reduce or control the emission of air contaminants. (§§ 1301, 1302.)[4] Thus, if one sought to build such a facility, a *written* permit to construct had to be obtained from the Control Officer before construction could begin. Upon completion of construction, a *written* permit to operate had to be secured from the Control Officer before the facility could be put into use.[5]

An applicant for a permit dissatisfied with the action of the Control Officer has a right to appeal (§§ 1306.2, 1306.3) to the Hearing Board[6] for an order reversing or modifying the decision of the Control Officer.

## The Issue

■ Simply put, the issue in the case is whether Standard in operating *all four units* is discharging significantly less particulates[7] into the air than it did when it operated with only three units.

There is little dispute about the amount of particulates all four units are emitting; there is a great deal of dispute as to what base line the

---

[4]Hereafter all section references are to regulation 2 of the District's regulations unless otherwise noted.

[5]The District's regulation 2 sections 1301 and 1302 are as follows: "§ 1301 Authority to Construct. No person shall construct any facility or building, or erect, alter, or replace any article, machine, equipment or other contrivance, the use of which may cause the emission of air contaminants, or the use of which may eliminate, reduce or control the emission of air contaminants unless he shall first have obtained written authorization for such construction, erection, alteration or replacement from the Air Pollution Control Officer." (Eff. July 1, 1972.)

"§ 1302 Authority to Operate. No person shall operate any facility or building, or any article, machine, equipment or other contrivance, the use of which may cause the emission of air contaminants, or the use of which may eliminate, reduce, or control the emission of air contaminants for which an authority to construct is required unless he shall first have obtained written authorization for such operation from the Air Pollution Control Officer." (Eff. July 1, 1972.)

[6]Health and Safety Code section 40800 directs that there shall be in each district one or more hearing boards each consisting of five members. One member shall be a lawyer, one a licensed professional engineer, one a medical doctor who has specialized in environmental, community or occupational-toxicologic medicine, and two shall be public members. (*Id.*, § 40801.) The Hearing Board, after hearing, may grant a permit denied by the Control Officer, reinstate an existing permit or it may revoke a permit. (*Id.*, § 42309.)

[7]There are a number of different kinds of pollutants emitted into the air by the refinery but only one kind, particulates, is in dispute.

current emissions are to be compared with in order to determine whether there has been a significant reduction.

There are other ancillary issues and we shall note and deal with them as they become pertinent in our discussion of the central issue.

*The Facts*

In 1973, Standard operated a facility producing fuel oil as well as other distillates of crude oil. The refining capacity of the facility was approximately 270,000 barrels per day (bpd) of crude oil. Standard was interested in expanding the facility in order to produce more fuel oil, fuel oil with a low sulfur content.[8] It contemplated certain alterations to its existing three units and the construction of a fourth unit to produce low sulfur fuel oil. The refining capacity as a result of the proposed project would be approximately 365,000 bpd; the new LSFO unit alone would have a capacity of 175,000 bpd.

Because there was a need for increased production of fuel oil and because low sulfur fuel oil is a "cleaner" fuel than high sulfur fuel oil, the project appeared to be a desirable one to the District from the standpoint of the public good.

The problem, however, was this: in producing fuel oil, a fuel is used to heat the furnaces. The combustion of that fuel produces air pollutants including particulates. The ambient air quality standards for particulates in the vicinity of the refinery was already exceeded in 1973. Section 1309 prohibited the issuance of a permit to construct a new source, i.e., the proposed new unit No. 4, when such a condition obtained.[9] Standard was so advised. Standard then sought consideration

---

[8]The lower the amount of sulfur in the fuel oil, the less pollutants will be emitted when the fuel oil is burned.

[9]Section 1309 of regulation 2 reads as follows: "§ 1309 Denial—Air Quality Standards exceeded in the vicinity. The Air Pollution Control Officer, after considering all information available about existing air quality, information about the emission of air contaminants from existing source operations, information about the emission of air contaminants from the proposed new source operation, shall deny an authority to construct, erect, alter, or replace any facility, building, article, machine, equipment or other contrivance, or an authority to operate any facility, building, article, machine, equipment or other contrivance, the use of which may cause the emission of a significant quantity of any air contaminant if any air quality standard adopted by the California Air Resources Board or the Environmental Protection Agency for such air contaminant from the proposed new source is exceeded in the vicinity in which it is proposed to be located." (Eff. Jan 18, 1973.)

under section 1311.[10] Section 1311 permits the replacement of one facility by another if the use of the replacement results in a reduction of each pollutant being emitted by the facility replaced.

The District took the position that since the productive capacity of the four units would be substantially greater than the productive capacity of the existing three units, the proposed construction could not be considered a "replacement" within the meaning of section 1311.

Eventually, Standard submitted an application whereby it agreed to shut down two of the three existing units at such time as the proposed unit No. 4 came on line and was in operation. The application further provides as follows: "After startup of the new crude unit [No. 4], we will limit operation of the above crude units as outlined in the foregoing [two units down if Unit No. 4 is operating] until applicable California and Federal air standards are met in the vicinity of the Refinery, or *applicable District regulations are revised to make operation of such units permissible,* or written approval for such operation is obtained from the BAAPCD [Bay Area Air Pollution Control District] or the BAAPCD Hearing Board." (Italics added.) The District approved the application as submitted under section 1311 and issued the authority to construct accordingly. Standard completed the project in 1976 at a cost of approximately $200 million.

In 1975, the District amended regulation 2 by adding thereto section 1311.2.[11] In effect, it required the Control Officer to issue a permit authorizing construction at existing facilities without regard to any "replacement" qualification provided that the operation of the facility *after construction would result in the emission of significantly less of each air contaminant than the use or operation of the original facility.*

---

[10]Section 1311 of Regulation 2 reads as follows: "§ 1311 Improvement by Replacement—Not Cause for Denial. The Air Pollution Control Officer shall not deny an authority to construct, erect, alter or replace, or an authority to operate, any facility, building, article, machine, equipment or other contrivance if the facility building, article, machine, equipment or other contrivance is a replacement for any existing facility, building, article, machine, equipment or other contrivance, and the new facility, building, article, machine, equipment or other contrivance will when used or operated result in the emission of less of each air contaminant than the use or operation of the original such facility, building, article, machine, equipment or other contrivance for which it is a replacement. This Section 1311 shall apply only if the original emissions were in compliance with District regulations." (Eff. July 1, 1972.)

[11]Section 1311.2 of regulation 2 reads as follows: "§ 1311.2 Significant Reduction of Emissions—Not Cause for Denial. The Air Pollution Control Officer shall not deny an authority to construct, erect, or alter, or an authority to operate, any buildings, articles,

In July 1976, Standard, upon completion of construction, began operating *with all four units*, pending issuance of a permit to operate. In August 1976, the District issued to Standard a permit to operate unit No. 4 on condition *that two of the preexisting units be shut down.*

It is Standard's position that the facility, after construction, is discharging significantly less particulates and, therefore, it complied with section 1311.2. Under the terms of its permit to construct, Standard concludes, because the District amended regulation 2 to allow, by section 1311.2, an expansion of an existing facility if the result is a significant decrease in each pollutant being discharged, Standard has a fundamental, vested right to operate with all four units going.

The District's position is that the new facility has *not* significantly reduced the quantity of particulates being emitted.

The evidence before the Hearing Board showed that with all *four units* operating, the facility actually discharged over a full year (July 1976 to June 1977) 2.4 tons per day (tpd) of particulates, whereas in the two years preceding 1973, the year of the issuance of the permit to construct, the discharge rate was 1.4 tpd, resulting in an *increase* of almost 70 percent in the amount of particulates discharged into the ambient air. This, the District contends, is the appropriate measure of compliance with section 1311.2.

Standard asserts that the comparison is improper. It points out that in the two years before construction, the facility was operating at less than capacity, refining 200,000 bpd, whereas its capacity was 270,000 bpd. Thus, Standard argues, the District should have calculated the amount of particulates that would have been emitted if the plant had been operating at full capacity in 1976, the year unit No. 4 came on line. Standard made such a projection and eventually came up with an answer of 3.9 tpd, thus the 1976-1977 actual discharge of 2.4 tpd would represent a significant decrease.

The District responded by pointing out that Standard had used a "worst case" in making its 1976 projection. "Worst case" in this instance means the following: the quantity of particulates discharged is

machines, equipment or other contrivance which will become part of an existing facility if the use or operation of such facility after such construction, erection, or alteration, will result in the emission of significantly less of each air contaminant than the use or operation of the original such facility." (Eff. Feb. 5, 1975.)

not only a function of the quantity of fuel oil produced, it is also a function of the kind of fuel that is used in the process of making fuel oil. Thus, if the furnaces are heated by gas, gas is a relatively "clean" fuel and emits proportionately much less pollutants as against fuel oil. Further, other fuels are used as well with differing rates of particulate emission. The District charges that for 1976 Standard "projected" for the preexisting units on the basis of a "dirty fuel slate"[12] and compared it with estimates for the modernized and expanded facility which assumed a much cleaner fuel slate. The District did its own projections of full capacity 1976 operation of preexisting units and of the refinery with the LSFO project, assuming, in each case, similar "dirty" or "clean" fuel slates, and found that the facilities would produce, respectively, 1.4 and 1.6 tpd of particulates (with a clean fuel slate) and 3.9 and 4.5 (with a dirty fuel slate). In either case the result of operating the new facility at full capacity would be to increase particulates by about 15 percent above the operation of the old facility at its full capacity.[13]

The Hearing Board took the position that section 1311.2 contemplated a "significant decrease" in the amount of pollutant being discharged by the facility after construction, as against the actual discharge before construction, using a reasonable time frame immediately preceding construction for the base line.

We believe the Hearing Board to be correct. The fact is that in the geographic area involved neither federal nor state standards as to the level of particulates in the ambient air have yet been met. The entire thrust of federal and state legislation has been to *reduce* the actual air pollution to acceptable levels, not to permit the pollution to become worse. Reduced to its essentials, Standard's argument is that while particulate pollution is worse with four units operating than it had been

---

[12]In the course of production over a period of time different fuels may be used at different times. This combination of fuels is referred to as a "fuel slate." There is evidence that in certain of Standard's projections used to calculate the quantity of particulates that would have been produced in 1976 by the preexisting units operating at full capacity, the "dirty fuel slate" would have resulted in an increase of other pollutants in violation of District emission regulations.

[13]We are bemused by Standard's projection showing that a plant that increases its refining by approximately 33 percent, i.e., from 75 percent of capacity to full capacity, would increase the particulate emission rate by approximately 270 percent, i.e., from the actual particulate emission rate of 1.4 tpd in 1971-1972 to the projected particulate emission rate in 1976 of 3.9 tpd.

with three units, it isn't as bad as it *could have been* with the three units going full bore using the "dirtiest fuel slate." The argument has a certain logical charm but people don't breathe logic. To the millions of people who inhale the air, it would appear to be a small consolation to be told that the quality of the air has been permitted to become worse but it isn't as bad as it "could have been."

We make it clear that we are well aware of the important role that the production of fuel oil plays in the national energy crisis. We are aware, too, of the substantial investment made by Standard. An investment in excess of $200 million is an imposing sum even in these days of double-digit inflation and federal budgets in excess of $500 billion. But, as against these considerations, the Legislature has found and declared that the people of this state "have a *primary interest* in the quality of the physical environment in which they live, and that this physical environment is being degraded by the waste and refuse of civilization polluting the atmosphere" (Health & Saf. Code, § 39000; italics added) and this "public interest shall be safeguarded by an intensive, coordinated state, regional, and local effort to *protect and enhance* the ambient air quality of the state" (*id.*, § 39001; italics added). It is apparent that it is the Hearing Board's interpretation of section 1311.2 that implements the legislative policy, not Standard's view.

We are further buttressed in our view by the very nature of the uncertain accuracy of projections. A projection is an attempt to predict a future event or result. It depends on certain assumptions. If the assumptions vary, the projection changes. If some assumptions turn out to be unjustified, the projection loses validity. In the case at bar, in 1973, Standard projected that the preexisting units operating at full capacity and using a dirty fuel slate would emit 4.3 tpd of particulates. It later revised that figure to 3.9 tpd. Thus, the first projection was approximately 10 percent higher than the second but the District, assuming a clean fuel slate, calculated the figure at 1.4 tpd, about 65 percent less than Standard's revised figure. Consider, too, that in 1973, Standard projected that the new facility in 1976, with all four units at full capacity, would emit 4.1 tpd. It then revised the figure to 2.5 tpd, a decrease of about 40 percent; in 1976, Standard did a third projection and this time the figure was 1.6 tpd. The first projection of 4.1 tpd was about 250 percent higher than the final projection. To cap it off, while the 1976 projection was 1.6 tpd, the actual emission for 1976-1977 was 2.4 tpd so that actual contamination was 50 percent higher than the 1976

projection. We cite these figures solely to show that the Hearing Board was justified in relying on the actual rather than the hypothetical.[14]

Finally, in this aspect, we believe that the principle that an administrative agency's interpretation of its own regulation is entitled to great weight and should be followed by the courts, unless clearly wrong, is applicable here.[15] The Control Officer took the view that section 1311.2 meant a significant decrease in contaminants as against actual operation in the past. On that basis, he issued in 1976 the authority to operate with two units shut down. When Standard nevertheless continued to operate all four units, the Control Officer brought action before the Hearing Board to revoke the authority to operate. Standard nevertheless argues that the Control Officer had interpreted the regulation in accordance with their views in 1973, at the time of the negotiation on the application for authority to construct. Whatever the Control Officer may have said in 1973, surely it cannot constitute an administrative interpretation of a section that did not come into existence until 1975. Certainly, in 1976 and thereafter, the Control Officer's view was unequivocal and opposed to Standard's position.

### Does Standard Have a "Fundamental Vested Interest" in Operating All Four Units?

Standard asserts that because it had a fundamental vested right to operate four units, the trial court was required to exercise its independent judgment on the facts. The trial judge ruled in favor of Standard; therefore, the issue on appeal is whether there is substantial evidence to support the trial court's ruling. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 [93 Cal.Rptr. 234, 481 P.2d 242]; *Harlow* v. *Carleson* (1976) 16 Cal.3d 731, 739 [129 Cal.Rptr. 298, 548 P.2d 698]; *Pasade-*

---

[14]This is not to suggest that projections do not serve a useful purpose and where there is no actual experience, obviously, projections must be used.

[15]The general rule is that "when an administrative agency is charged with enforcing a particular statute, its interpretation of the statute will be accorded great respect by the courts 'and will be followed if not clearly erroneous. [Citations.]'" (*Judson Steel Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 668 [150 Cal.Rptr. 250, 586 P.2d 564].) When the construction of an administrative regulation is in issue, the administrative interpretation is shown even greater deference. (*Udall* v. *Tallman* (1964) 380 U.S. 1, 16-17 [13 L.Ed.2d 616, 625, 85 S.Ct. 792]; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 13 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; *Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 325 [109 P.2d 935]; *Westfall* v. *Swoap* (1976) 58 Cal.App.3d 109, 114 [129 Cal.Rptr. 750].)

na *Unified Sch. Dist.* v. *Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53].)

We disagree for several reasons.

■ 1. The dispute between the parties does *not* turn upon a *factual issue.* While superficially it would appear that the question of whether there has been a significant decrease in pollutant after construction, as against before construction, would appear to be a factual one, the real question, as we have shown, was whether the current emissions were to be measured against the actual experience before construction as the District contended, and the Hearing Board held, or against projections as to what could have been emitted in 1976 by the preexisting units. That question is a legal question involving an interpretation of section 1311.2 in the light of the environmental control regulations and statutes. (*Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 310 [118 Cal.Rptr. 473, 530 P.2d 161].) Of course, the trial court was not bound by the District and Hearing Board interpretations but neither are we bound by the "substantial evidence" rule advocated by Standard.

2. Ordinarily, we would not address the question of whether Standard had a "fundamental, vested right" to operate all four units because the issue is irrelevant in light of our holding that the issue is a legal one rather than a factual one. ■ However, because of the importance of the question in this context and the likelihood that this issue may arise again, we hold that if the problem of whether there was a significant decrease in particulates had been a *factual* one, the trial court erred in exercising its independent judgment on the evidence for Standard had neither a "fundamental" nor a "vested" right to operate all four units.

a. There is no magic formula for determining whether a right is "fundamental." Rather, "[t]he courts must decide on a case-by-case basis whether an administrative decision or class of decisions substantially affects fundamental vested rights and thus requires independent judgment review. [Citations.] As we shall explain, the courts in this case-by-case analysis consider the nature of the right of the individual: whether it is a fundamental and basic one, which will suffer substantial interference by the action of the administrative agency, . . .

"In determining whether the right is fundamental the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation. . . .

"In analyzing the fundamental nature of the right asserted, this court, manifesting slighter sensitivity to the preservation of purely economic privileges, has found that the owners of Bay Bridge bonds had no fundamental vested right in preventing the construction of a second toll crossing on the San Rafael-Richmond Bridge [citation], and that a water company had no fundamental vested right to a permit to divert water from the Kern River. [Citation.] Thus, likewise, in *Beverly Hills Fed. S. & L. Assn. v. Superior Court* (1968) 259 Cal.App.2d 306, 316-317 [66 Cal.Rptr. 183], several savings and loan associations with offices in Beverly Hills attempted to protect their interest in being free from additional competition by opposing the license application of another Beverly Hills savings and loan organization. Justice Hufstedler observed for the court that 'By no stretch of imagination can petitioners' interest in being free from competition be deemed a "vested" right. Petitioners do have a vested right in being permitted to continue operating their existing savings and loan businesses. That right, however, is not here threatened.' (259 Cal.App.2d at pp. 316-317.)" (*Bixby v. Pierno, supra*, 4 Cal.3d at pp. 144-146; fns. omitted.)

Our Supreme Court has not deviated from *Bixby* in the intervening years, rather it has emphasized its continuing vitality. (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34 [112 Cal.Rptr. 805, 520 P.2d 29]; *Harlow v. Carleson, supra*, 16 Cal. 3d 731, 736-737; *Dickey v. Retirement Board* (1976) 16 Cal.3d 745, 750-751 [129 Cal.Rptr. 289, 548 P.2d 689]; *Anton v. San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 823 [140 Cal.Rptr. 442, 567 P.2d 1162].)

In the case at bench, we are concerned with a "purely economic" privilege toward the preservation of which our Supreme Court has been "manifesting slighter sensitivity." There is no contention that Standard will be driven to financial ruin by the action of the District; there is not even a contention that this particular facility will be forced to operate at a loss and close. It is true that Standard will not be able to produce as much fuel oil as it would want to and could produce.[16] It may be that

---

[16]We point out that even with "2 units down" the production capacity of the plant after construction was 5,000 bpd more than the production capacity of the preexisting units.

its operation of this facility will not be as profitable with three units as it could be with four. It may be that the return on its considerable investment will fall short of what it might have been. None of these circumstances, nor all of them, makes Standard's right to operate four units instead of three "fundamental."

b. Standard argues that it had a "vested" right to operate four units. Its theory is that when it received its authority to construct, it was authorized to operate all four units at such time as "applicable District regulations are revised to make operation of such units permissible." When section 1311.2 was adopted in 1975, Standard's projections of what all four units would emit showed that the emission of particulates would be significantly less than its projections of what the three preexisting units would emit based upon operation at full capacity. Therefore, operation of all four units was "permissible" under section 1311.2 and vested. Thus Standard could lawfully operate all four units when construction was complete. We disagree.

A right is "vested" when it is "'already possessed'" or "'legitimately acquired.'" (*Harlow* v. *Carleson, supra*, 16 Cal.3d at p. 735.) Here, after completion of the construction in 1976, Standard had no right to operate any units because they had no written authority to operate as required by section 1302. Implicit in Standard's position is that the granting by the District of an authority to operate once the construction had been completed was purely a formality. We do not perceive that to be the regulatory scheme. Obviously the purpose of requiring written authority to operate is to enable the Control Officer to decide whether the facility after construction is completed, would do that which it was supposed to do, in this instance, comply with the applicable regulations. Can it be seriously contended that if the Control Officer concluded that the facility as completed would actually increase pollution, he had to issue an authority to operate nonetheless? Such a construction of section 1302 would make it meaningless.

The recent Supreme Court opinion in *Interstate Brands* v. *Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770 [163 Cal.Rptr. 619, 608 P.2d 707], makes it clear that a trial court shall exercise its independent judgment on an administrative decision when *either* a fundamental interest in the Bixby sense *or* a vested interest in the traditional sense is involved. But, as we have analyzed Standard's interest, it is neither "fundamental" nor "vested."

Thus, if the issue here were a factual one, the trial court would have erred in exercising its independent judgment on the administrative record. It remains only to say that there was substantial evidence to support the factual determination of the Hearing Board that the level of particulates had not been significantly reduced.

As was eloquently put in *Mobil Oil Corp.* v. *Superior Court* (1976) 59 Cal.App.3d 293, 305 [130 Cal.Rptr. 814]: "Here it appears the Oil Companies are asking us to determine they have a fundamental vested right to release gasoline vapors while dispensing fuel to their customers. How are we to answer the public, on the other hand, who assert a fundamental vested right to breathe clean air? If either exists, it must be the latter. We are not presented with the enforcement of a rule which effectively drives the Oil Companies out of business. At most it puts an economic burden on them increasing the cost of doing business. In weighing the relative importance to individuals in the life situation, it is manifest the Oil Companies' right to continue releasing gasoline vapors into the atmosphere is neither fundamental nor vested. The trial court will use an evidentiary rule of 'substantial evidence in light of the whole record'...."

### *Did the District in Issuing the Authority to Construct Give to Standard the Authority to Determine Compliance With Section 1311.2?*

■ Standard contends that paragraph (d) of the authority to construct (see fn. 3, *ante*) constituted a delegation, in effect, from the District to Standard of the power to determine whether operation of the four units complied with section 1311.2. We do not so read it.

We read paragraph (d) to say that *if* the regulations are changed and *if* the District decides that operation of the four units complies with the new or changed regulation, then the shut-down limitation will not be applicable. In other words, if the law or the regulations are changed, Standard will be permitted to do what the law and the regulations allow; it would not be "locked-into" the two-unit down limitation. It would seem to have been a reasonable act by the District and, in fact, it is still the District's position that Standard will be permitted to operate all four units at such time as the District finds that such operation complies with its regulations.

Further, if Standard's strained interpretation of paragraph (d) were correct, and the District did intend to delegate to Standard its power to decide whether the facility met a change in the requirements of the regulations, such a delegation would be void and unenforceable as against public policy. (See *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 800 [132 Cal.Rptr. 386, 553 P.2d 546].)

*Is the District Estopped From Using*
*the Actual Preconstruction Emissions*
*as a Base Line?*

Standard argues that at the time of the 1973 negotiations, the District agreed that a projection of the amount of particulates that would be produced by the three preexisting units operating at full capacity would be the appropriate base line to be used in the event of a change in the regulation that might permit the operation of all four units. Further, Standard alleges that it was "apparent" in 1973 that a new regulation would be issued permitting an expansion in production by additional construction such as Standard was proposing. In reliance of the foregoing Standard made its handsome investment.

There is a welter of conflicting evidence as to whether it was represented to Standard that projections could be used as a base line. Suffice it to say that the Hearing Board found that the District had not represented to Standard that projections could be so used. There is substantial evidence to support that finding.

But even if the District had represented that a base line premised upon a projection would be acceptable, was Standard induced to spend $200 million thereby? An essential element in estoppel is that the injured party relied upon the party to be estopped. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423]; 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 132, p. 5352.)

Any representation made in 1973 as to base lines could only have been in the context of a *future* change in regulation 2; it was irrelevant in terms of the regulation as it existed in 1973. Thus, Standard could only have "relied" if it knew not only that there was going to be a change in regulation 2 *but what the change would be and when.* Standard says that it was "apparent" that there would be a change but Standard could not be so prescient as to know that the change would

make "base lines" a relevant consideration. It overstrains credulity to believe that Standard invested $200 million on the proposition that the District, at some future date, would effect such a change in its regulations as would make possible the operation of all four units.[17]

And, even if, as Standard claims, the District made similar representations in 1975 and 1976, this was long after Standard had received its authority to construct and had begun construction so that, in the nature of things, Standard could not have relied on those representations in undertaking the project.

■ Finally, our Supreme Court has very recently held that "Estoppel will not ordinarily lie against a governmental agency if the result will be the frustration of a strong public policy." *Bib'le* v. *Committee of Bar Examiners* (1980) 26 Cal.3d 548, 553 [162 Cal.Rptr. 426, 606 P.2d 733].) Here, to raise an estoppel against the District would be to permit an increase in the level of pollution in the ambient air breathed by our people, "a frustration of a strong public policy" enunciated by the Legislature and embodied in law.

The judgment of the trial court is reversed; it is directed to vacate its writ of mandamus and enter its judgment denying the petition for said writ.

White, P. J., concurred.

---

[17]We point out that section 1311.2 was not promulgated until 1975, more than *15* months after Standard received its authority to construct. Parenthetically, we observe that in 1977, section 1311.2, as it read at times relevant here, was eliminated and wholly different criteria substituted.

Further, Health and Safety Code section 40703 requires that: "(a) A district board shall not adopt, amend, or repeal any rule or regulation without first holding a public hearing thereon.

"(b) Notice of the time and place of a public hearing to adopt, amend, or repeal any rule or regulation shall be given not less than 30 days prior thereto to the state board, which notice shall include a copy of the rule or regulation proposed to be adopted, amended, or repealed, as the case may be, and by publication in the district pursuant to Section 6061 of the Government Code. In the case of a district which includes portions of more than one county, the notice shall be published in each such county."

Standard nowhere contends that at the time of its application for and receipt of the authority to construct, the District had given notice of any public hearing to be held for the purpose of adding section 1311.2 as required by Health and Safety Code section 40703.

**SCOTT, J.—**I dissent.

Appellant, the Air Pollution Control Officer of the Bay Area Pollution Control District, appeals from a judgment granting the issuance of a peremptory writ of mandamus under Code of Civil Procedure section 1094.5. The district's hearing board, upon application by appellant, ordered respondent's permit to operate a low sulphur fuel oil facility at its Richmond, California refinery revoked on February 2, 1978. The superior court's writ ordered the hearing board to set aside its order revoking respondent's permit. I would affirm the judgment.

This action encompasses events which date back to the year 1973. In that year respondent, Standard Oil Company, operated a refinery at Richmond, California consisting of three crude units which produced high sulphur fuel oil. The refinery's capacity at that time was approximately 270,000 barrels per day (bpd) of fuel oil, though it had been operating for several years at a capacity of approximately 200,000 bpd due to the deactivation of several pieces of equipment. In response to a recognized critical need for low sulphur fuel oil, respondent and appellant began discussions in 1973 concerning the construction of a low sulphur fuel oil project at the refinery. The plan contemplated certain alterations to the existing three crude units and the construction of a fourth crude unit to produce low sulphur fuel oil. It was estimated that the alterations and construction would result in an increase of capacity at the refinery from 270,000 bpd to 365,000 bpd.

In order to proceed with construction and, subsequently, to operate the new facility it was necessary for respondent to acquire an authority to construct[1] and a permit to operate[2] from the district. The application and issuance of these permits were, at all relevant times, governed by

---

[1]Section 1301 provides: "Authority to Construct. No person shall construct any facility or building, or erect, alter, or replace any article, machine, equipment or other contrivance, the use of which may cause the emission of air contaminants, or the use of which may eliminate, reduce or control the emission of air contaminants unless he shall first have obtained written authorization for such construction, erection, alteration or replacement from the Air Pollution Control Officer." (Eff. July 1, 1972.)

[2]Section 1302 provides: "Authority to Operate. No person shall operate any facility or building, or any article, machine, equipment or other contrivance, the use of which may cause the emission of air contaminants, or the use of which may eliminate, reduce, or control the emission of air contaminants for which an authority to construct is required unless he shall first have obtained written authorization for such operation from the Air Pollution Control Officer." (Eff. July 1, 1972.)

the district's regulation 2.[3] That regulation was adopted to effectuate the mandate of Health and Safety Code section 40001, directing the district to "endeavor to achieve and maintain the federal ambient air quality standards" established by the Environmental Protection Agency. (See 40 C.F.R. pt. 50.)

Section 1309[4] of that regulation requires the denial of a new source permit where the use or operation of a new facility "may cause the emission of any air contaminant if any [state or federal] air quality standard...for such air contaminant from the proposed new source is exceeded in the vicinity in which it is proposed to be located." At the time of respondent's application for an authority to construct, the federal ambient air quality standards were exceeded in the Bay Area. Thus, unless respondent's application fell within an exception to the provisions of section 1309, it could not be granted.

Section 1311[5] of the district's regulation provides that a permit will not be denied if the proposed new facility is a "replacement" of an existing facility and the new facility "will when used or operated result in the emission of less of each air contaminant than the use or operation of the original such facility...for which it is a replacement." Respondent submitted its application for consideration under section 1311.

[3]All citations to district regulations are to those regulations as they were written at the time of the events which are the basis of this appeal.

[4]Section 1309 provides: "Denial—Air Quality Standards exceeded in the vicinity. The Air Pollution Control Officer, after considering all information available about existing air quality, information about the emission of air contaminants from existing source operations, information about the emission of air contaminants from the proposed new source operation, shall deny an authority to construct, erect, alter, or replace any facility, building, article, machine, equipment or other contrivance, or an authority to operate any facility, building, article, machine, equipment or other contrivance, the use of which may cause the emission of a significant quantity of any air contaminant if any air quality standard adopted by the California Air Resources Board or the Environmental Protection Agency for such air contaminant is proposed to be located." (Eff. Jan. 18, 1973.)

[5]Section 1311 provides: "Improvement by Replacement—Not Cause for Denial. The Air Pollution Control Officer shall not deny an authority to construct, erect, alter or replace, or an authority to operate, any facility, building, article, machine, equipment or other contrivance if the facility, building, article, machine, equipment or other contrivance is a replacement for any existing facility, building, article, machine, equipment or other contrivance and the new facility, building, article, machine, equipment or other contrivance will when used or operated result in the emission of less of each air contaminant than the use or operation of the original such facility, building, article, machine, equipment or other contrivance for which it is a replacement. This Section 1311 shall apply only if the original emissions were in compliance with District regulations." (Eff. July 1, 1972.)

In evaluating respondent's application, the district interpreted section 1311's replacement requirement to refer to replacement of existing capacity of the refinery. For this purpose, the district determined the refinery had an existing capacity of 270,000 bpd even though it was operating at only approximately 200,000 bpd. Since the proposed project's capacity would have been significantly greater than the 270,000 bpd capacity of the then existing refinery, the district rejected respondent's application.

Subsequently, Standard submitted an application whereby it agreed to shut down two of the three existing units at such time as the proposed unit four came on line and was in operation. The application further provided "After startup of the new crude unit [No. 4], we will limit operation of the above units as outlined in the foregoing [two units down if unit No. 4 is operating] until applicable California and federal air standards are met in the vicinity of the refinery, or applicable District regulations are revised to make operation of such units permissible, or written approval for such operation is obtained from the BAAPCD [Bay Area Pollution Control District] or the BAAPCD Hearing Board." The effect of the shutdown condition was to limit the capacity of the refinery after construction (new refinery) to approximately 275,000 bpd, which the district considered sufficiently close to the 270,000 bpd capacity of the refinery before construction (old refinery) to be deemed a replacement for purposes of section 1311. The requirement that the new facility emit less of each air contaminant having been already met to the district's satisfaction, the district approved the application as submitted under section 1311 and issued an authority to construct accordingly. Standard completed the project in 1976 at an approximate cost of $200 million.

In December of 1974, the district amended regulation 2 by adding section 1311.2.[6] In effect, it prohibited the control officer from denying a permit authorizing construction at existing facilities without regard to any "replacement" requirement provided that the operation of the facility after construction would result in the emission of significantly

---

[6]Section 1311.2 provides: "Significant Reduction of Emissions—Not Cause for Denial. The Air Pollution Control Officer shall not deny an authority to construct, erect, or alter, or an authority to operate, any buildings, articles, machines, equipment or other contrivance which will become part of an existing facility if the use or operation of such facility after such construction, erection, or alteration, will result in the emission of significantly less of each air contaminant than the use or operation of the original such facility." (Eff. Feb. 5, 1975.)

less of each air contaminant than the operation of the facility before construction.

In July 1976, Standard, upon completion of construction, began operating with all four units. It had not received authority to operate. In August 1976, the district issued to Standard a permit to operate unit No. 4 which contained the same condition, that two of the preexisting units be shut down, as was contained in the authority to construct.

On January 7, 1977, the district filed with the hearing board an "Application for Permit Revocation Pursuant to Health and Safety Code sections 42307-42309." The application alleged that the grounds for the revocation of the permit to operate were based upon violations of the specific terms of the permit to operate, i.e., failure to shut down two of the three preexisting crude units during operation of crude unit No. 4. After hearing and argument, the hearing board, on February 2, 1978, issued an order revoking the permit to operate crude unit No. 4.

Respondent filed a petition for a writ of mandamus in the superior court seeking review of the revocation of the permit to operate. After hearing, the superior court determined that respondent had a fundamental vested right to operate crude unit No. 4 and issued a peremptory writ ordering the hearing board to set aside its order revoking the permit and to declare the shutdown condition in the permit null and void. This appeal followed.

Standard contends that its refinery, after construction, fits within the terms of section 1311.2 and that, therefore, under the terms of its permit to operate, it no longer must abide by the shutdown condition. Appellant contends that the refinery, after construction, does not fit within the terms of section 1311.2 and that, therefore, the operation of all four units at once constitutes a violation of the terms of the permit to operate.

The central issue in this case is the proper interpretation of section 1311.2 of the district's regulation 2. The dispute between the parties is over the proper base line to which the emissions of the facility after construction are to be compared in order to determine whether there has been a significant reduction in the emissions of each air contaminant as a result of the construction.

Appellant contends that the proper base line is the *actual* emissions of the refinery prior to construction. Respondent contends that the proper base line is the projected level of emissions of the old refinery operating at full capacity in 1976, the year unit No. 4 came on line. The difference between these two interpretations is significant in light of the fact that for two years prior to the date of its application for authority to construct respondent had been operating its refinery at reduced capacity.

Both parties agree that under either interpretation there has been a significant reduction of all air contaminants except particulates. Evidence before the hearing board showed that, according to estimates submitted to and accepted by appellant in conjunction with the application for authority to construct, the new refinery with all four units operating would emit 1.6 tons per day (tpd) of particulates. Observed emissions of particulates for the year ending in July 1977 were 2.4 tpd. It was estimated that the old refinery, operating at full capacity under conditions expected to be present in 1976, would have emitted 3.9 tpd. The actual emissions of particulates at the old refinery, operating at reduced capacity in 1972, was 1.4 tpd.

It is apparent that respondent's right to operate the new refinery at full capacity turns upon which interpretation of section 1311.2 is adopted. If appellant's position is adopted, the project would not be in conformance with section 1311.2: *actual* emissions prior to construction were 1.4 tpd where both the projected and observed emissions after construction were higher. If respondent's position is adopted, the project would be in conformance with section 1311.2: projected emissions of the old refinery operating at full capacity in 1976 were 3.9 tpd where both projected and observed emissions after construction were lower.

Respondent contends that it had a fundamental vested right to operate all four units, the trial judge properly exercised his independent judgment on the facts, and, therefore, the issue on appeal is whether there is substantial evidence to support the trial court's findings of fact. (*Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53]; *Harlow* v. *Carleson* (1976) 16 Cal.3d 731, 739 [129 Cal.Rptr. 298, 548 P.2d 698]; *Bixby* v. *Pierno* (1971) 4 Cal.3d 731, 739 [93 Cal.Rptr. 234, 481 P.2d 242].)

The question before this court, however, does not turn upon a factual issue but rather upon a legal one: the proper interpretation of section 1311.2. "In reviewing . . . an agency decision a court must determine whether the administrative agency applied the proper legal standard in evaluating the evidence before it. [Citation.] The interpretation of a regulation, like the interpretation of a statute, is, of course, a question of law [citations], and while an administrative agency's interpretation of its own regulation obviously deserves great weight [citations], the ultimate resolution of such questions rests with the courts." (*Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 310 [118 Cal.Rptr. 473, 530 P.2d 161].)

When interpreting a statute or regulation a court should determine the legislative intent in order to effectuate the purpose of the statute or regulation. (*People* v. *Caudillo* (1978) 21 Cal.3d 562, 576 [146 Cal. Rptr. 859, 580 P.2d 274]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) Here the intent of the district in adopting section 1311.2 can be ascertained by referring to controlling federal legislation and the specific circumstances under which the district adopted the regulations.

The Bay Area Pollution Control District is a regional agency which has an integral role to play in implementing federal ambient air quality standards under the federal Air Quality Act of 1967 (81 Stat. 485), as amended by the Clean Air Amendments of 1970 (Pub. L. No. 91-604, 84 Stat. 1676). Under that act, achievement of the ambient air quality standards was left to the states which were required to prepare and enforce a state implementation plan, subject to the approval of the Environmental Protection Agency.

In California the Legislature has created the State Air Resources Board with overall control of the effort to achieve ambient air quality standards (Health & Saf. Code, §§ 39002, 39003) but has given to local and regional bodies, such as the district, "the primary responsibility for control of air pollution from all sources other than emissions from motor vehicles." (Health & Saf. Code, § 40000.) As stated above, these local bodies are directed to "endeavor to achieve and maintain the federal ambient air quality standards." (Health & Saf. Code, § 40001.)

As the House Report to the federal Clean Air Amendments of 1970 makes clear, the purpose of that statute was to achieve national effective air pollution control, which includes "both reduction of

present pollution and prevention of new significant pollution problems." (House Rep. No. 91-1146, 1970 U.S.Code Cong. & Admin. News, pp. 5360-5361.)

The district's regulation 2 was adopted to effectuate this mandate. Section 1309 requires the denial of a new source application where the proposed source would emit significant quantities of any contaminant for which any federal or state air quality standard is exceeded in the vicinity of the new source. Since air quality in the San Francisco Bay Area has never attained the standards established by the Environmental Protection Agency, the district could not approve any new source application unless there was some exception to the provisions of section 1309.

The provisions of section 1311 were intended to prevent this obviously undesirable result. That section allows the replacement of an existing facility if the use of the new facility will result in the emissions of less of each air contaminant than the use of the old facility. It is apparent from the record that section 1311.2 was adopted in response to the limitations which the replacement requirement imposed upon new source development. The extent of these limitations became apparent during the processing of respondent's application for an authority to construct. Under the district's interpretation of section 1311, respondent would be unable to alter its existing refinery to increase its capacity even if the net effect of the alterations would be to significantly reduce the level of emissions of each air contaminant. Such a result would not further the purposes of the federal Clean Air Amendments and would be particularly inappropriate in light of the critical need for low sulphur fuel oil. Section 1311.2 was adopted with the intent to permit new source construction and operation consistent with the basic goal of the federal Clean Air Amendments.

Appellant and amicus contend that only by adopting the *actual* emissions of the old refinery as the base line for the purposes of section 1311.2 will the intent of section 1311.2 be effectuated. They argue that no other interpretation would result in the reduction of *present* pollution. The purpose of the federal Clean Air Amendments, however, is to both reduce present pollution *and* prevent the development of significant new pollution problems. Appellant's interpretation, as accepted by the majority here, ignores these dual purposes. In 1973 respondent's refinery was operating at reduced capacity. It is not contested that

respondent, under its operating permits and the applicable regulations, could have reactivated its equipment and operated the old refinery at full capacity. To do so would have resulted in significantly greater levels of pollutants being emitted. Only by adopting the projected level of emissions of the refinery operating at full capacity in 1976 as the base line for the purposes of section 1311.2 can an accurate determination of whether the proposed project would result in a significant reduction of emissions be made. This interpretation is consistent with the purpose of the federal Clean Air Amendments since it allows the construction and operation of new source development which would aid in the prevention of the development of significant new pollution problems. This can be seen by reference to the present case: the record shows that the level of emissions from the new refinery is significantly lower than it would have been if there had been no new construction.

The majority's interpretation of section 1311.2 would also encourage conduct inconsistent with the purposes of the federal Clean Air Amendments. A simple example will suffice to illustrate this point. Assume that a facility owner operates, at 50 percent capacity, an old facility which cannot burn clean fuel. The facility produces particulate emissions of 100 tpd. If the owner has a need to double his activities within three years, he faces a choice between (1) operating the old facility at full capacity in the third year and producing particulate emissions of 200 tpd which his permit allows, or (2) altering the facility so that it can burn cleaner fuel and produce particulate emissions of 120 tpd. Under the majority's interpretation, the district could not approve the alteration because it would not compare favorably to past emissions. The necessary effect of applying this interpretation is to force the facility owner either to produce substantially more emissions from the expanded operation of the old facility, or to continually operate an original facility at the dirtiest possible level so that, if and when expansion is required, authorization to construct may be obtained. Neither course of action would be consistent with the purpose of the federal Clean Air Amendments.

The majority's interpretation of section 1311.2 fails to take into account that respondent, under its operating permits and the applicable regulations, could operate the old refinery at full capacity and, therefore, does not lead to an accurate determination of whether the new refinery would result in a significant reduction in the level of emissions of air contaminants. This failure would encourage conduct inconsistent with the purpose of the federal Clean Air Amendments.

I would hold that section 1311.2 allows the use of projected emissions of the old refinery operating at full capacity, under conditions that were expected to be present in 1976, as the base line to which the emissions of the new refinery are to be compared for the purposes of determining whether there has been a significant reduction.

Amicus and appellant's argument that the calculation of projected emissions is highly speculative and subject to self-serving manipulations is unconvincing. The district has a technical staff whose competence, presumably, includes the ability to evaluate the accuracy of the projections made by applicants. In fact, the record reveals that the district accepted projections made by Standard in evaluating its application under section 1311 and, apparently, had no difficulty in assessing their accuracy. In any event, amicus and appellant's position is fatally flawed in that the district's own interpretation of section 1311.2 requires the use of projected emissions from the proposed facility in order to determine, at the time of issuing an authority to construct, if there will be a reduction of emissions. If the district is competent to evaluate projected emissions of the proposed facility, it is competent to evaluate projected emissions of the old facility. To the extent an applicant may have a tendency to manipulate projections to serve its own interests, this tendency may be corrected by a careful review of the projections by the district.

Appellant further argues that, even if projected emissions of the old refinery are adopted as the base line, the projections made by respondent in 1973 should not be adopted for the purposes of assessing respondent's permit under section 1311.2. Appellant contends that respondent's projections compare the emissions of the old refinery and the new refinery utilizing different fuel slates. Appellant argues that Standard has compared the case showing *maximum* emissions of the old refinery with the case showing *minimum* emissions of the new refinery. Appellant does not contest, however, that respondent could have operated, under its operating permits and applicable regulations, the old refinery at full capacity under conditions which would result in the level of emissions Standard projected. Adopting this maximum level, if that is the case, as the base line for purposes of section 1311.2 is reasonable in light of the purposes of that section. A significant reduction in the level of emissions respondent had a right, under its operating permits, to emit would serve to help prevent the development of significant new pollution problems. In addition, the district had an opportunity to re-

view these projections in 1973 in conjunction with the application under section 1311 and accepted them as a reasonable comparison.

Appellant's contention that the trial court erred in not issuing findings of fact and conclusions of law is unsound. Appellant waived findings of fact and conclusions of law when it failed to request them within the time allowed by law. (See Code Civ. Proc., §§ 632, 1109; Cal. Rules of Court, rule 232(c); *Kennedy* v. *South Coast Regional Com.* (1977) 68 Cal.App.3d 660, 666-667 [137 Cal.Rptr. 396].)

I would affirm the judgment.

A petition for a rehearing was denied May 30, 1980, and the opinion was modified to read as printed above. Scott, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied July 30, 1980. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.