[No. C065784. Third Dist. Dec. 27, 2011.]

JOSEPH HARDESTY et al., Plaintiffs and Appellants, v.
SACRAMENTO METROPOLITAN AIR QUALITY MANAGEMENT
DISTRICT et al., Defendants and Respondents;
CALIFORNIA AIR RESOURCES BOARD, Intervener and Respondent.

## COUNSEL

Kronick, Moskovitz, Tiedemann & Girard, Scott A. Morris and William T. Chisum for Plaintiffs and Appellants.

Kathrine C. Pittard for Defendants and Respondents Sacramento Metropolitan Air Quality Management District and Larry Greene.

Hanson Bridgett and Kimon Manolius for Defendants and Respondents Sacramento Metropolitan Air Quality Management District Hearing Board and Hearing Board Members.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Assistant Attorney General, Sara J. Russell and Deborah L. Barnes, Deputy Attorneys General, for Intervener and Respondent.

## OPINION

**HOCH, J.**—Joseph and Yvette Hardesty are the owners of Hardesty Sand and Gravel (Hardesty), an open-pit mining operation located near Sloughhouse. The Sacramento Metropolitan Air Quality Management District (District) obtained from its hearing board an abatement order directing Hardesty to cease operation of the central plant equipment and all internal combustion engines with a rating greater than 50 horsepower until Hardesty obtained a permit from the District. Hardesty then filed a petition for writ of mandate in the trial court, seeking an order directing the District to vacate and cease enforcement of the abatement order. The California Air Resources Board (Board) intervened in opposition to Hardesty's writ petition. The trial court denied the petition.

Hardesty appeals, arguing (1) the trial court should have used the independent judgment standard in reviewing the hearing board's decision to issue the abatement order; (2) the District's permit program, which contains an exemption for equipment that emits less than two pounds of pollutants in any 24-hour period, is preempted by the federal Clean Air Act (CAA; 42 U.S.C. § 7401 et seq.) because it contains an emissions standard that has not been approved by the Environmental Protection Agency (EPA); (3) the District cannot require a permit for the diesel-powered generator that runs the central plant equipment because that engine is registered under the statewide Portable Equipment Registration Program (PERP) and the Board has not suspended or revoked this registration; (4) the generator is validly registered under PERP because it is a "portable internal combustion engine" within the meaning of Health and Safety Code section 41751[1]; (5) the central plant equipment does not emit at least two pounds of pollutants in any 24-hour period; and (6) the District's attempt to regulate Hardesty's mining operation improperly interferes with vested mining rights.

We disagree with each contention and affirm the trial court's order denying Hardesty's writ petition. As we shall explain, because Hardesty does not have a fundamental vested right to emit air pollution without a permit from the District, the trial court properly reviewed the hearing board's factual determinations under the substantial evidence standard. Turning to the merits, we conclude the District's permit program is not preempted by the CAA because the two-pound-per-day emissions threshold applies to stationary equipment, not mobile sources of air pollution. We also conclude the District possesses the regulatory authority to determine whether a particular PERP registration is valid and, if not, to require a local permit, which it did in this case with respect to the generator supplying power to the central plant. Substantial

---

[1] Undesignated statutory references are to the Health and Safety Code.

evidence supports the hearing board's determination that the generator re-mained at the Hardesty mining operation for more than 12 consecutive months, and therefore was not eligible for PERP registration. With respect to the central plant equipment, substantial evidence supports the hearing board's conclusion that this equipment emits at least two pounds of pollutants in any 24-hour period. Finally, requiring Hardesty to obtain a permit from the District does not improperly interfere with vested mining rights.

## BACKGROUND

### *Regulatory Scheme*

We begin with a brief overview of California's air quality regulatory scheme in order to place the facts of this case in their proper context. Provisions important to the resolution of this appeal will be examined in greater detail in the discussion that follows.

California has divided responsibility for control of air pollution between the Board and 35 local and regional air quality management districts. One of these districts is the Sacramento Metropolitan Air Quality Management District, as mentioned above. (§ 40960.)

The Board is "charged with coordinating efforts to attain and maintain ambient air quality standards, to conduct research into the causes of and solution to air pollution, and to systematically attack the serious problem caused by motor vehicles, which is the major source of air pollution in many areas of the state." (§ 39003.) The Board has exclusive responsibility for control of emissions from motor vehicles, while the local and regional districts have primary responsibility for control of air pollution from all sources other than emissions from motor vehicles. (§§ 39002, 39500, 40000.) These districts "shall adopt and enforce rules and regulations to achieve and maintain the state and federal ambient air quality standards in all areas affected by emission sources under their jurisdiction, and shall enforce all applicable provisions of state and federal law." (§ 40001, subd. (a).)

Prior to 1997, "portable equipment" was exclusively regulated by the local and regional districts. Accordingly, owners who used their portable equipment in more than one district were required to obtain separate permits for each district in which the equipment operated. (See § 41750, subd. (a) ["Existing law authorizes each district to impose separate and sometimes inconsistent emission control requirements for, and to require separate permits to operate, portable equipment that are used at various sites throughout the state."].) Concluding that this "multiplicity of permits and regulatory requirements impose[d] a complex and costly burden on California businesses that use,

hire, provide, and manufacture that equipment" (§ 41750, subd. (b)), the Legislature directed the Board to establish by regulation "an optional registration program for portable equipment that is, or may be, used in more than a single district," and to establish "emission limits and emission control requirements" for such equipment. (§ 41752, subd. (a); see also § 41754.)

As relevant here, " 'portable equipment' includes any portable internal combustion engine and equipment that is associated with, and driven by, any portable internal combustion engine." (§ 41751, subd. (a)(1).) A " 'portable internal combustion engine' is any internal combustion engine that, by itself, or contained within or attached to a piece of equipment, is portable or transportable." (§ 41751, subd. (a)(2)(A).) And " 'portable or transportable' means designed to be, and capable of being, carried or moved from one location to another. Indicia of portability or transportability include, but are not limited to, wheels, skids, carrying handles, or a dolly, trailer, or platform." (§ 41751, subd. (a)(2)(B).) However, such an engine is not portable if "[t]he engine remains, or will remain, at a fixed location for more than 12 consecutive months. For purposes of this paragraph, a 'fixed location' is any single site at a building, structure, facility, or installation." (§ 41751, subd. (b)(1).)

Section 41753, subdivision (a), expresses the intent of the Legislature that "the registration of, and the regulation of emissions from, portable equipment that is operated in more than one district and that is subject to the registration program be done on a uniform, statewide basis by the [Board] and that the permitting, registration, and regulation of portable equipment by the districts be preempted." However, this subdivision also provides that "if the owner or operator of portable equipment elects not to register under the statewide registration program, the unregistered portable equipment shall be subject to district permitting requirements pursuant to district regulations." (§ 41753, subd. (a).)

The local and regional districts are required to "enforce the statewide registration program, emission limitations, and emission control requirements established by the [Board] pursuant to this article in the same manner as a district rule or regulation." (§ 41755, subd. (a).) The Board has adopted regulations implementing the program. (Cal. Code Regs., tit. 13, § 2450 et seq.) These regulations provide: "Once registration is issued by the [Board's] Executive Officer, district permits or district registrations for engines or equipment units registered in the Statewide Registration Program are preempted by the statewide registration and are, therefore, considered null and void, except for the following circumstances where a district permit shall be required: [¶] . . . [¶] (4) at any specific location where statewide registration is not valid. The owner of the engine or equipment unit shall

obtain a district permit or registration for the location(s) where the statewide registration is not valid . . . ." (Cal. Code Regs., tit. 13, § 2453, subd. (*l*)(4).)

### *The Hardesty Mining Operation*

Hardesty operates an open-pit sand and gravel mining operation at the Schneider Historic Mine (mine site) near Sloughhouse. The mine site encompasses 3,900 acres along Meiss Road, and was historically the site of gold mining operations. Hardesty began working the mine site in the early 1980's. The central plant periodically moves from one portion of the mine site to another. The last relocation occurred between 2005 and 2006 when the plant was moved from the south side of Meiss Road to the north side of the road. Thus, at the time of the hearing on the abatement petition, the plant had spent about four years at the same location.

The Hardesty operation involves digging out the tailings left by the gold mining process (consisting of soil, sand, gravel, and cobblestone) and loading the material onto conveyor belts, which connect to various pieces of equipment, including a trommel scrubber, cone crusher, shakers, and sand screws (central plant equipment). This equipment washes and sorts the material by size and then deposits it into piles located around the conveyor system. The conveyors and other equipment feed outward from a 932-horsepower diesel engine (central plant engine), which serves as the central plant power source.

Water is used at all stages of the operation. With respect to the trommel scrubber, one of the shakers, and the sand screws (the sand production portion of the plant), water is required for the equipment to operate properly. With respect to the remainder of the plant, water is not required to operate the equipment, but is used to control particulate emissions (dust) and to improve the quality of the material ultimately deposited into the various piles and sold to customers. Once the material is deposited into these piles, the surface layer has a tendency to dry out in the sun, producing dust unless controlled by spraying water on the piles.

### *The District's Attempts to Regulate Hardesty*

In August 2006, the District discovered the Hardesty mining operation and issued a notice of violation for operating a sand and gravel facility without a permit. Hardesty then obtained PERP registrations for the central plant engine and a portion of the central plant equipment (i.e., one receiving hopper, one screen, and two conveyors).

In March 2007, the District sent Hardesty a letter requesting additional information in order to determine whether the mining operation used any

other engines or equipment requiring a local permit, and whether the PERP-registered engine and equipment were in fact eligible for the program. Hardesty did not respond. Two months later, the District sent another letter explaining that it considered the mining operation to be a stationary source and directing Hardesty to apply for local permits from the District within 90 days. Ninety days later, Hardesty responded with a one-line letter stating: "I am in compliance with the State Agency and have wheels and tires under my portable plant." The District's response pointed out that the issue was not whether the plant was portable in the literal sense, but whether it qualified for PERP registration. The District again concluded that because "the equipment is operated as part of a stationary source," the "state registrations (PERP) are not valid at this location and local permits are required."

In August 2008, the District attempted to inspect the Hardesty facility, but was denied access. The next month, the District issued another notice of violation for operating the facility without a district permit. This prompted another exchange of letters. The District maintained its position that the central plant engine and equipment were ineligible for PERP registration. Hardesty insisted that the central plant engine was eligible for the program because it had been moved periodically for repair and use, but submitted no records of offsite use and provided no information about the central plant equipment.

In March 2009, the District obtained a warrant and inspected the Hardesty facility. In addition to the central plant equipment described above, inspectors discovered three "Tier-0" engines, which were manufactured before the EPA adopted emissions standards and are ineligible for PERP registration. One of these engines is a 1,170-horsepower generator (1170 engine), which Hardesty described during the inspection as a "backup engine." Inspectors observed electrical lines running from the trailer housing this engine towards the central plant and determined the engine had been operated recently due to the fact that it was connected to fuel and "warm to the touch."

In June 2009, District inspectors twice returned to the mine site. During these inspections, Hardesty denied that the 1170 engine was a backup engine and stated that it was purchased to supply power to an impact crusher but was never operated. Additionally, during the March inspection the 1170 engine had a control panel with an hour meter, but by the time the inspectors returned three months later, the control panel had been removed and the hole covered with duct tape.

*Abatement Petition*

The District filed a petition for order of abatement, alleging that Hardesty was operating the central plant engine and equipment, the 1170 engine, and

three other engines, without a permit in violation of district rule 201.[2] This rule requires "[a]ny person operating an article, machine, equipment or other contrivance, the use of which may cause, eliminate, reduce, or control the issuance of air contaminants, [to] first obtain a written permit from [the District]." (Rule 201, pt. 302.) The rule also contains several exemptions. Two such exemptions are relevant to this appeal: (1) "[i]nternal combustion engines with a manufacturer's maximum continuous rating of 50 brake horsepower or less" and (2) "[o]ther equipment . . . which would emit any pollutants without the benefit of air pollution control devices less than 2 pounds in any 24 hour period." (Rule 201, pts. 112.1, 122.)

Following a multiday hearing, the District's hearing board found the central plant equipment was subject to the District's permitting authority because the central plant is a stationary source of pollution, the equipment is not PERP registered, and the equipment does not qualify for an exemption from rule 201. While the central plant engine was PERP registered, the hearing board found the registration was not valid for two reasons: (1) the engine had resided at the same location for more than 12 consecutive months and (2) the engine was used to power a stationary source at which grid power was available. The hearing board also found that the 1170 engine, two other Tier-0 engines, and an additional engine that was eligible for PERP but not registered, were subject to the District's permit requirements. The hearing board ordered Hardesty to obtain a permit from the District and to cease operations until such permit was obtained.

### Petition for Writ of Mandate

Hardesty filed a petition for writ of mandate in the trial court, seeking an order directing the District to vacate and cease enforcement of the abatement order. Hardesty essentially argued the same issues below that it raises on appeal. The Board intervened in opposition to Hardesty's writ petition. The trial court denied the petition. Hardesty appeals.

### DISCUSSION

### I

### Standard of Review

Hardesty contends we must reverse the denial of his petition for writ of mandate because the trial court did not use the independent judgment standard in reviewing the hearing board's decision to issue the abatement order. We disagree.

---

[2] Undesignated rule references are to the district rules.

■ "If the decision of an administrative agency substantially affects a 'fundamental vested right,' the trial court must not only examine the administrative record for errors of law, but also must exercise its independent judgment upon the evidence. However, when the administrative decision neither involves nor substantially affects such a right, the trial court must review the entire administrative record to determine whether the findings are supported by substantial evidence and if the agency committed any errors of law." (*Whaler's Village Club v. California Coastal Com.* (1985) 173 Cal.App.3d 240, 251 [220 Cal.Rptr. 2], fn. omitted; see *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32 [112 Cal.Rptr. 805, 520 P.2d 29]; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481 P.2d 242]; Code Civ. Proc., § 1094.5.)

The administrative decision at issue in this case is the hearing board's decision to order Hardesty to obtain a permit from the District and to cease operation until such permit is obtained. In determining whether this decision substantially affects a fundamental vested right, we must decide whether it substantially affects a right that has been " ' "legitimately acquired or is otherwise 'vested,' " ' " and whether that right is "fundamental" in the sense of "the importance of [the right] to the individual" and "the effect of the right in economic and human terms." (*Frink v. Prod* (1982) 31 Cal.3d 166, 177 [181 Cal.Rptr. 893, 643 P.2d 476].) As our Supreme Court has explained: "[T]he effect and importance of rights and the degree to which they are possessed are to be weighed together" and "the 'search for "vestedness" and the search for "fundamentalness" are one and the same. The ultimate question in each case is whether the affected right is deemed to be of sufficient significance to preclude its extinction or abridgement by a body lacking *judicial* power.' [Citation.]" (*Id.* at p. 178; see *Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 779–780 [163 Cal.Rptr. 619, 608 P.2d 707].)

In *Standard Oil Co. v. Feldstein* (1980) 105 Cal.App.3d 590 [164 Cal.Rptr. 403] (*Standard Oil*), the Court of Appeal held the decision of the Bay Area Air Pollution Control District's hearing board to require Standard Oil Company to shut down certain refinery units did not affect a fundamental vested right. (*Id.* at pp. 602–604.) In that case, Standard obtained a permit from the district to construct a new refinery unit provided the company shut down two of three preexisting refinery units while the new unit operated. This condition would persist until district regulations were revised to allow operation of these units; Standard argued that a certain amended regulation did just that and proceeded to operate all four units. (*Id.* at pp. 597–599.) The district disagreed with Standard's interpretation of the amended regulation, issued a permit to operate the new unit only if two of the three preexisting units were shut down, and prevailed before their hearing board. (*Id.* at pp. 599–600.) The trial court exercised its independent judgment on the administrative record and invalidated the permit condition. (*Id.* at p. 594.)

While the Court of Appeal held as a matter of law that the amended regulation did not authorize Standard to operate all four units, the court also held that the trial court erred by using the independent judgment standard of review. (*Standard Oil, supra*, 105 Cal.App.3d at pp. 602–606.) As the court explained, "we are concerned with a 'purely economic' privilege toward the preservation of which our Supreme Court has been 'manifesting slighter sensitivity.' [(Quoting *Bixby v. Pierno, supra*, 4 Cal.3d at pp. 144–146.)] There is no contention that Standard will be driven to financial ruin by the action of the District; there is not even a contention that this particular facility will be forced to operate at a loss and close. It is true that Standard will not be able to produce as much fuel oil as it would want to and could produce. It may be that its operation of this facility will not be as profitable with three units as it could be with four. It may be that the return on its considerable investment will fall short of what it might have been. None of these circumstances, nor all of them, makes Standard's right to operate four units instead of three 'fundamental.' " (*Id.* at pp. 604–605, fn. omitted.)

Similarly, in *Mobil Oil Corp. v. Superior Court* (1976) 59 Cal.App.3d 293 [130 Cal.Rptr. 814] (*Mobil Oil*), the Court of Appeal held the decision of the Air Pollution Control District of San Diego County's hearing board requiring two oil companies to install certain gasoline vapor recovery systems at their gas stations did not affect a fundamental vested right. The court explained: "Here it appears the Oil Companies are asking us to determine they have a fundamental vested right to release gasoline vapors while dispensing fuel to their customers. How are we to answer the public, on the other hand, who assert a fundamental vested right to breathe clean air? If either exists, it must be the latter. We are not presented with the enforcement of a rule which effectively drives the Oil Companies out of business. At most it puts an economic burden on them increasing the cost of doing business. In weighing the relative importance to individuals in the life situation, it is manifest the Oil Companies' right to continue releasing gasoline vapors into the atmosphere is neither fundamental nor vested." (*Id.* at pp. 304–305; see also *Sherwin-Williams Co. v. South Coast Air Quality Management Dist.* (2001) 86 Cal.App.4th 1258, 1273 [104 Cal.Rptr.2d 288] [paint companies cannot assert a property right to emit pollution].)

Hardesty claims independent judgment review is required for two reasons. First, Sacramento County determined in 1994 that the mining operation did not require a use permit because the property owner possessed a vested right to mine the property. Hardesty acknowledges that this does not give the company "an unregulated right to mine" or "an unfettered right to pollute the environment." However, Hardesty argues that it does give the company the right to operate the central plant equipment without District interference as long as it does not emit at least two pounds of any pollutant in any 24-hour period. Second, Hardesty argues that it has a vested right to operate the

central plant engine under the PERP registration without being required to secure a separate permit from the District. According to Hardesty, these rights are fundamental in both economic and human terms. We are not persuaded. Like *Standard Oil, supra*, 105 Cal.App.3d 590 and *Mobil Oil, supra*, 59 Cal.App.3d 293, there is nothing in the administrative record to indicate that Hardesty will be driven out of business by the requirement that it secure a permit from the District.

Moreover, the questions that occupy the majority of Hardesty's appellate briefs, i.e., whether the District's regulation of Hardesty is preempted by the CAA and whether the District possesses the regulatory authority to declare a PERP registration invalid, are questions of law subject to de novo review. As we explain below, we conclude the District's regulations are not preempted by the CAA and the District does possess the authority to declare a PERP registration invalid. Thus, the only factual questions that the trial court could have decided differently had it used the independent judgment standard are (1) whether the central plant equipment emits at least two pounds of any pollutant in any 24-hour period, and (2) whether the central plant engine (a) remained at the mine site for more than 12 consecutive months, or (b) supplied power to a stationary source at which grid power was available. The hearing board's determination of these factual questions resulted in an order directing Hardesty to obtain a permit from the District. Hardesty's purported right to operate a sand and gravel mine without such a permit is not "of sufficient significance to preclude its extinction or abridgement by a body lacking *judicial* power." (*Interstate Brands v. Unemployment Ins. Appeals Bd., supra*, 26 Cal.3d at p. 779, fn. 5.)

Nor are we persuaded by Hardesty's reliance on *Goat Hill Tavern v. City of Costa Mesa* (1992) 6 Cal.App.4th 1519, 1525–1526 [8 Cal.Rptr.2d 385] (*Goat Hill Tavern*) and *The Termo Co. v. Luther* (2008) 169 Cal.App.4th 394 [86 Cal.Rptr.3d 687] (*Termo*). In *Goat Hill Tavern*, the Court of Appeal held the independent judgment standard of review applied to Costa Mesa's decision to deny a tavern owner's application for renewal of a conditional use permit. (*Goat Hill Tavern*, at p. 1527.) The tavern had been in continuous operation since 1955, before the enactment of a zoning ordinance requiring a conditional use permit for an establishment serving food or beverages within 200 feet of a residential zone. A conditional use permit was issued in 1974, allowing a beer garden to be added to the tavern. The tavern changed hands in 1984. The new owner spent more than $1.75 million to renovate the tavern and add a game room. He then applied for and was given a six-month conditional use permit for the expansion. The permit was renewed for another three months. The city then denied the owner's application for a third renewal. (*Id.* at pp. 1522–1524.)

The Court of Appeal held "the rights affected by the city's refusal to renew Goat Hill Tavern's permit are sufficiently vested and important to preclude their extinction by a nonjudicial body." (*Goat Hill Tavern, supra,* 6 Cal.App.4th at p. 1527.) Acknowledging that "courts have rarely upheld the application of the independent judgment test to land use decisions" (*ibid.*), the court explained: "Goat Hill Tavern has been in operation for over 35 years as a legal nonconforming use. [The owner] invested over $1.75 million in its refurbishment, including substantial exterior facade improvements undertaken at the city's behest. He then sought a conditional use permit to allow the addition of a game room, which was granted on a temporary basis. Now, with the expiration of the permit, the city urges he has lost all right to continue in business. [¶] We cannot conclude on these unique facts that [the owner's] right to continued operation of his business is not a fundamental vested right. This is not, as the city so strongly urges, a 'purely economic privilege.' It is the right to continue operating an established business in which he has made a substantial investment." (*Id.* at p. 1529, fn. omitted.)

Unlike *Goat Hill Tavern, supra,* 6 Cal.App.4th 1519, the decision of the District's hearing board does not amount to the loss of Hardesty's right to continue in business. Hardesty must first secure a permit from the District in order to do so. Nor is this case remotely like *Termo, supra,* 169 Cal.App.4th 394, in which the state oil and gas director ordered the plugging and abandonment of 28 oil wells, terminating the right of a small oil company to extract oil from those wells. (*Id.* at p. 398.) There, the Court of Appeal held the independent judgment standard of review applied because "implementation of the Order and the Decision would have the effect not only of shutting down a business that has been in existence for 20 years or more, but also of terminating the right to produce oil—an extraordinarily valuable resource, especially in the current economic era. There is no indication that the real property underlying [those wells] was not legitimately acquired or that the drilling and pumping of oil was not undertaken in accordance with applicable statutory mandates. Therefore, we must conclude that the right to extract oil is vested. Moreover, the right is fundamental considering its potentially massive economic aspect and its considerable effect in human terms." (*Id.* at pp. 407–408.) Again, in this case, there is nothing in the administrative record to indicate that Hardesty will be driven out of business by the requirement that it secure a permit from the District.

Because the abatement order does not substantially affect a fundamental vested right, the trial court correctly reviewed the administrative record to determine whether the hearing board's findings were supported by substantial evidence. We use the same standard of review on appeal. (*Jaramillo v. State Bd. for Geologists & Geophysicists* (2006) 136 Cal.App.4th 880, 889 [39 Cal.Rptr.3d 170].) And while questions of statutory construction are subject to de novo review on appeal, we must "adhere to the well-settled principle of

affording 'great weight' to 'the contemporaneous administrative construction of [a statute] by those charged with its enforcement . . . .' " (*Carmel Valley Fire Protection Dist. v. State of California* (1987) 190 Cal.App.3d 521, 536 [234 Cal.Rptr. 795], quoting *Coca-Cola Co. v. State Bd. of Equalization* (1945) 25 Cal.2d 918, 921 [156 P.2d 1]; see *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 309 [58 Cal.Rptr.2d 855, 926 P.2d 1042].) An administrative agency's interpretation of its own regulation is shown even greater deference. (*Standard Oil, supra,* 105 Cal.App.3d at p. 602, fn. 15; *Udall v. Tallman* (1965) 380 U.S. 1, 16–17 [13 L.Ed.2d 616, 625, 85 S.Ct. 792]; *Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 13 [95 Cal.Rptr. 329, 485 P.2d 529].)

II

*Federal Preemption*

Hardesty asserts the District's attempt to regulate the central plant engine is preempted by the CAA because rule 201 contains an emissions standard that has not been approved by the EPA. Specifically, Hardesty refers to the portion of the rule that exempts from the District's permit requirements "[o]ther equipment . . . which would emit any pollutants without the benefit of air pollution control devices less than 2 pounds in any 24 hour period." (Rule 201, pt. 122.) Hardesty is mistaken.

The CAA makes "the States and the Federal Government partners in the struggle against air pollution." (*General Motors Corp. v. United States* (1990) 496 U.S. 530, 532 [110 L.Ed.2d 480, 485, 110 S.Ct. 2528].) Under title I of the CAA, the EPA is responsible for establishing primary and secondary national ambient air quality standards (NAAQS's) for each air quality control region, setting permissible levels of concentration for various pollutants. (42 U.S.C. §§ 7408–7409.) The states, however, are primarily responsible for assuring air quality within their borders by submitting for EPA approval state implementation plans for achieving the NAAQS's. (42 U.S.C. §§ 7407, 7410.) The CAA contemplates that the states will carry out this responsibility "chiefly by regulating stationary sources, such as factories and power plants." (*Engine Manufacturers Assn. v. U.S. Environmental Protection Agency* (D.C. Cir. 1996) 319 U.S. App.D.C. 12 [88 F.3d 1075, 1078–1079]; see 42 U.S.C. § 7416.)

Under title II of the CAA, the EPA directly sets emissions standards for mobile sources of air pollution, including motor vehicles and "nonroad" engines and vehicles. (42 U.S.C. §§ 7521, 7547.) "Because the regulation of mobile source emissions is a federal responsibility, Congress has expressly preempted states from setting emissions standards for mobile sources."

*(Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.* (9th Cir. 2011) 644 F.3d 934, 938; see 42 U.S.C. § 7543(a) & (e).) California, however, has been granted an exemption from this preemption provision so long as it obtains EPA approval for its emissions standards. (42 U.S.C. § 7543(b) & (e)(2)(A).) Other states may then " 'opt in' to the California standards by adopting identical standards as their own." *(Engine Manufacturers Assn. v. U.S. Environmental Protection Agency, supra,* 88 F.3d at p. 1080; see 42 U.S.C. §§ 7507, 7543(e)(2)(B).)

Hardesty's argument fails because the "less than 2 pounds [of any pollutant] in any 24 hour period" (rule 201, pt. 122) exemption does not apply to the central plant engine. All internal combustion engines with a rating above 50 horsepower are subject to the District's permit requirement regardless of emissions level. (Rule 201, pt. 112.1.) The emissions exemption Hardesty cites applies to "[o]ther equipment," which includes the central plant equipment, but Hardesty does not argue that title II of the CAA prevents the District from applying an emissions standard to this equipment. Such an argument would fail because the central plant equipment is not a mobile source of air pollution within the meaning of the CAA. Indeed, by the date of the abatement hearing, this equipment had been at the same location for about four years.

In any event, even if the emissions exemption applied to the central plant engine, this engine is not a "nonroad" engine within the meaning of the CAA. (42 U.S.C. §§ 7521, 7547.) A nonroad engine is "any internal combustion engine" that "is portable or transportable, meaning designed to be and capable of being carried or moved from one location to another. Indicia of transportability include, but are not limited to, wheels, skids, carrying handles, dolly, trailer, or platform." However, such an engine is not a nonroad engine if it "remains or will remain at a location for more than 12 consecutive months or a shorter period of time for an engine located at a seasonal source. A location is any single site at a building, structure, facility, or installation. Any engine (or engines) that replaces an engine at a location and that is intended to perform the same or similar function as the engine replaced will be included in calculating the consecutive time period." (40 C.F.R. § 89.2 (2011).) Because, as we explain below, substantial evidence supports the hearing board's determination that the central plant engine remained at the Hardesty mining operation for more than 12 consecutive months, this engine is not a "nonroad" engine within the meaning of the CAA.

## III

*State Preemption*

■ Hardesty also claims the District cannot require a permit for the central plant engine because that engine has a PERP registration and the Board's executive officer has not suspended or revoked this registration. According to Hardesty, because section 41753 precludes the District from requiring a local permit "upon the registration of portable equipment by the portable equipment owner or operator" (§ 41753, subd. (b)), and because the regulations implementing the program provide the Board's executive officer with exclusive authority to suspend or revoke a PERP registration (Cal. Code Regs., tit. 13, § 2463), the District cannot declare a PERP registration invalid and require a local permit. We are not persuaded.

■ Issues of statutory interpretation are questions of law subject to de novo review. (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1492 [35 Cal.Rptr.3d 596].) "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy. [Citations.]" (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563]; see *San Leandro Teachers Assn. v. Governing Bd. of San Leandro Unified School Dist.* (2009) 46 Cal.4th 822, 831 [95 Cal.Rptr.3d 164, 209 P.3d 73].)

As Hardesty correctly observes, section 41753, subdivision (b), provides that "upon the registration of portable equipment by the portable equipment owner or operator, a district shall not, with respect to the affected portable equipment, . . . [¶] (1) Require a permit for the construction or operation of the portable equipment." Subdivision (a) of section 41753 declares the intent of the Legislature that "the registration of, and the regulation of emissions from, portable equipment *that is operated in more than one district and that is subject to the registration program* be done on a uniform, statewide basis by the [Board] and that the permitting, registration, and regulation of portable equipment by the districts be preempted." (Italics added.) However, this subdivision also provides that "if the owner or operator of portable equipment

elects not to register under the statewide registration program, the unregistered portable equipment shall be subject to district permitting requirements pursuant to district regulations." (§ 41753, subd. (a).)

The Board's regulations implementing the program provide: "These regulations preempt districts from permitting, registering, or regulating portable engines and equipment units, including equipment necessary for the operation of a portable engine (e.g. fuel tanks), registered with the [Board's] Executive Officer . . . *except in the circumstances specified in the regulations.*" (Cal. Code Regs., tit. 13, § 2450, italics added.) The regulations also provide: "Once registration is issued by the Executive Officer, district permits or district registrations for engines or equipment units registered in the Statewide Registration Program are preempted by the statewide registration and are, therefore, considered null and void, *except for the following circumstances where a district permit shall be required*: [¶] . . . [¶] (4) *at any specific location where statewide registration is not valid. The owner of the engine or equipment unit shall obtain a district permit or registration for the location(s) where the statewide registration is not valid . . . .*" (Cal. Code Regs., tit. 13, § 2453, subd. (*l*)(4), italics added.)

The Legislature has required local and regional districts to "enforce the statewide registration program, emission limitations, and emission control requirements established by the [Board] pursuant to this article in the same manner as a district rule or regulation." (§ 41755, subd. (a).) The Board's regulations also provide that an owner or operator of PERP-registered engines or equipment units "may operate within the boundaries of the State of California *so long as such registered engines or equipment units comply with all applicable requirements of this article and any other applicable federal or State law.*" (Cal. Code Regs., tit. 13, § 2454, subd. (c)(2), italics added.)

■ Read together, these provisions establish a regime under which a portable engine that has a valid PERP registration is not subject to the District's permit requirements. Where a PERP registration has been obtained, and is valid at the specific location where the engine is operated, any permit issued by the District is a nullity. However, where a PERP registration has not been obtained, or where the registration is invalid at the specific location where the engine is operated, a local permit from the District is required. Because the District is charged with enforcing PERP registration requirements in the same manner as the District's own rules or regulations, we conclude the District must possess the authority to determine whether a PERP registration is valid, and if not, to require a local permit.

Contrary to Hardesty's argument on appeal, the fact that the Board's executive director has exclusive authority under the regulations to suspend or revoke a PERP registration does not evince the intent of the Legislature, or the drafters of the Board's regulations, that the District cannot declare a PERP registration invalid *at a specific location* and require a local permit *at that location.* For instance, if the owner of a PERP-registered engine who operated the engine for brief periods of time at several different locations throughout the state decided to operate the engine at a single location for more than 12 consecutive months, he or she would be required to obtain a local permit to operate the engine at that location because the engine would not be "portable" as used at that location. (See § 41751, subd. (b)(1).) But if the same owner then decided to return to using the engine for brief periods of time at different locations, the engine would regain its portability under PERP, and the owner could operate it under the PERP registration without obtaining local permits for these locations. Thus, the fact that a PERP registration is invalid at a specific location does not mean that the registration must be suspended or revoked; and it certainly does not mean that the entity in charge of suspending or revoking the registration is the only entity that may declare it invalid at a specific location.

Nor are we persuaded by Hardesty's reliance on the PERP registration itself, which provides: "The portable engine shall not be operated under both statewide registration and a district permit at any specific location." Hardesty's apparent concern is that it will be forced to violate this provision if required to obtain a permit from the District. Not so. If the PERP registration was valid at the Hardesty mine site and the District improperly required Hardesty to obtain a local permit, that permit would be a nullity. (Cal. Code Regs., tit. 13, § 2453, subd. (*l*)(4).) However, because the PERP registration is invalid, Hardesty is required to obtain and operate under a local permit from the District. In neither scenario would Hardesty be required to operate the engine under both a PERP registration and a permit from the District.

Finally, our conclusion that the District possesses the regulatory authority to determine whether a PERP registration is valid at a specific location, and if not, to require a local permit, is bolstered by the fact that this is also the interpretation of both the Board and the District. When an administrative agency is charged with enforcing a particular statute, its interpretation of the statute is entitled to great weight and should be followed by the courts unless clearly wrong; an administrative agency's interpretation of its own regulation is shown even greater deference. (*People ex rel. Lungren v. Superior Court,*

*supra*, 14 Cal.4th at p. 309; *Sail'er Inn, Inc. v. Kirby, supra*, 5 Cal.3d at p. 13.) Here, the Board drafted the PERP regulations and the District is charged with enforcing the program at particular locations. Accordingly, their interpretation of the PERP statutes and regulations is entitled to great weight.

IV

*Portability of the Central Plant Engine*

We now turn to Hardesty's contention that the central plant engine is in fact portable within the meaning of section 41751. Using the appropriate standard of review, we conclude substantial evidence supports the hearing board's determination that this engine remained at the Hardesty mining operation for more than 12 consecutive months, and therefore was not eligible for PERP registration.[3]

As already mentioned, section 41751 defines " 'portable equipment' " to include "any portable internal combustion engine and equipment that is associated with, and driven by, any portable internal combustion engine." (§ 41751, subd. (a)(1).) A " 'portable internal combustion engine' is any internal combustion engine that, by itself, or contained within or attached to a piece of equipment, is portable or transportable." (§ 41751, subd. (a)(2)(A).) And " 'portable or transportable' means designed to be, and capable of being, carried or moved from one location to another. Indicia of portability or transportability include, but are not limited to, wheels, skids, carrying handles, or a dolly, trailer, or platform." (§ 41751, subd. (a)(2)(B).) However, such an engine is not portable if "[t]he engine remains, or will remain, at a fixed location for more than 12 consecutive months. For purposes of this paragraph, a 'fixed location' is any single site at a building, structure, facility, or installation." (§ 41751, subd. (b)(1).)

Hardesty does not dispute that the central plant engine had powered the central plant equipment at the mine site since at least August 2006. At the hearing on the abatement petition, the District presented evidence that this engine was purchased in October 2005 and used to power the central plant beginning when the plant was located on the south side of Meiss Road and continuing after the move to the north side of the road. The District also

---

[3] Because this determination is sufficient to render the central plant engine ineligible for PERP registration, we need not decide whether substantial evidence supports the hearing board's conclusion that a local permit was required for the central plant engine for the separate reason that this engine supplied power to a stationary source at which grid power was available.

presented evidence this engine was housed in a trailer with "a significant amount of silt buildup," which indicated to District inspectors that the trailer had not been moved in quite some time. The engine was also connected to fuel and power distribution lines that would take "some effort" to disconnect in order to remove the engine from its location.

Hardesty does dispute that the central plant engine remained at the mine site for any *consecutive* 12-month period. According to Hardesty, the engine left the site on multiple occasions for repairs. However, both the hearing board and trial court found that offsite movement for purposes of repair paused, but did not reset, the 12-month residency clock. The Board's PERP regulations provide: "The period during which the engine or equipment unit is maintained at a storage facility shall be excluded from the residency time determination." (Cal. Code Regs., tit. 13, § 2452, subd. (dd)(1).) The hearing board reasoned that, like maintaining an engine at a storage facility, simply moving the engine to a repair facility "does not implicate the strong policy rationale underlying the PERP, which was to avoid multiple and duplicative permitting by local air districts." We agree with this assessment. Excluding these repair visits from the residency time determination, the central plant engine remained at the mine site for well over 12 consecutive months.

Hardesty also asserts the central plant engine left the mine site on three occasions for actual use. According to Hardesty: (1) the engine left the mine site to do exploratory work near Placerville in February 2007; (2) the engine left the mine site to do exploratory work in Nevada in January 2008; and (3) the engine left the mine site to do exploratory work in Ione in December 2008. We conclude Hardesty's failure to present any documentation of these purported periods of offsite use is fatal to the claim that the 12-month residency clock reset.

The Legislature has recognized that the Board would need to establish "recordkeeping and recording requirements . . . for the purpose of tracking portable equipment utilization and movement," but directed that these requirements "shall be the minimum that is necessary to . . . allow adequate enforcement of the registration program." (§ 41754, subd. (f).) The Board implemented this directive by requiring portable equipment operators to maintain a record of "the specific location where the registered unit is located . . . each time the equipment unit is brought to a new location including relocation for the purposes of storage. The date the equipment unit was placed at the new location shall also be recorded." (Cal. Code Regs., tit. 13, § 2458, subd. (a)(2)(D).) "For engines, the specific location where the registered engine is located . . . shall be recorded no less than once a month." (Cal. Code Regs., tit. 13, § 2458, subd. (a)(2)(E).) The hearing board concluded that "[o]ne of the reasons for record-keeping requirements is to

prevent after-the-fact arguments such as the one made here by [Hardesty]. If the [hearing board] were to entertain the argument that [Hardesty was] in compliance even in the absence of record-keeping, the entire regulatory scheme would be undermined." We agree. It would make no sense to allow Hardesty to use the PERP regulations as a defense to the District's permit requirements while simultaneously allowing Hardesty to prevent the District from verifying the company's compliance with the program.

Rather than submit documentation establishing the engine had been moved for offsite use, Hardesty attempted to prove such movement with the testimony of Dan Tankersley, a man who had worked closely with Hardesty for 12 to 13 years. The hearing board rejected this testimony as "not persuasive or credible." This credibility determination was more than reasonable. (See *Estate of Jones* (2004) 122 Cal.App.4th 326, 337 [18 Cal.Rptr.3d 637] [where evidence necessary to establish a fact essential to a claim lies peculiarly within the knowledge and competence of one of the parties, that party has the burden of going forward with the evidence on the issue]; Evid. Code, § 412 ["If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust."].)

Moreover, even if Hardesty had established the central plant engine was used at these other locations, substantial evidence would still support the hearing board's determination that the engine violated the 12-month residence requirement. This is so because the Board's PERP regulations provide: "Any engine or equipment unit such as back-up or stand-by engines or equipment units, that replace engine(s) or equipment unit(s) at a location, and is intended to perform the same or similar function as the engine(s) or equipment unit(s) being replaced, will be included in calculating the consecutive time period. In that case, the cumulative time of all engine(s) or equipment unit(s), including the time between the removal of the original engine(s) or equipment unit(s) and installation of the replacement engine(s) or equipment unit(s), will be counted toward the consecutive time period . . . ." (Cal. Code Regs., tit. 13, § 2452, subd. (dd)(1).) Here, the District presented substantial evidence the 1170 engine served as a backup engine. While Hardesty cites Tankersley's testimony in which he stated the 1170 engine did not and could not have served as a backup engine, this testimony merely created a conflict in the evidence. The administrative record supports the hearing board's resolution of this conflict.

We conclude substantial evidence supports the hearing board's determination that the central plant engine remained at the mine site for more than 12 consecutive months.

## V

*Central Plant Equipment Emissions*

Substantial evidence also supports the hearing board's determination that the central plant equipment emits at least two pounds of pollutants in any 24-hour period.

Hardesty argues that substantial evidence supports the conclusion that the central plant equipment does not emit at least two pounds of pollutants in any 24-hour period. In support of this argument, Hardesty cites the testimony of Scott Taylor, an environmental engineer who testified that based on the information he received from Hardesty concerning the amount of water used in operating the plant, the plant would generate less emissions than the two-pound threshold. Hardesty's argument turns the standard of review on its head. The question is not whether there is substantial evidence to support Hardesty's conclusion that the equipment does not require a permit, but whether there is substantial evidence to support the hearing board's conclusion that it does. There is such evidence in the administrative record.

As already mentioned, rule 201 contains an exemption for equipment "which would emit any pollutants *without the benefit of air pollution control devices* less than 2 pounds in any 24 hour period." (Rule 201, pt. 122, italics added.) In determining whether this exemption applies to a sand and gravel operation, the District takes the rate at which the operation processes the aggregate material and multiplies that by certain emission factors depending on the particular process involved. The District considers the use of water for dust suppression to be an air pollution control device and calculates the emission level based on operation of the equipment without the use of water. But where the equipment requires water to operate properly, the District assumes the equipment does not emit dust and excludes this equipment from the calculation.

At the Hardesty operation, the trommel scrubber, one of the shakers, and the sand screws require water to operate properly. This equipment was excluded from the District's emission level calculation. With respect to the remainder of the central plant equipment, the District calculated an estimated emission level for each year it was able to obtain mining production information. Based on the 2005 production level, the District calculated an emission level of 2.55 pounds per day. Based on the 2006 production level, the District calculated an emission level of 2.98 pounds per day. Based on the 2007 production level, the District calculated an emission level of 4.26 pounds per day. And based on the production level information Hardesty provided to Taylor, the District calculated an emission level of 5.64 pounds

per day. Indeed, Taylor agreed that uncontrolled equipment emissions would exceed the two-pound emission threshold.[4]

We conclude this evidence was more than sufficient to support the hearing board's conclusion that the central plant equipment emits at least two pounds of pollutants in any 24-hour period.

## VI

### *Vested Mining Rights*

Nor do we accept Hardesty's position that requiring a permit from the District will improperly interfere with vested mining rights.

■ As Hardesty correctly observes, the Surface Mining and Reclamation Act of 1975 (SMARA) (Pub. Resources Code, § 2710 et seq.) provides: "No person who has obtained a vested right to conduct surface mining operations prior to January 1, 1976, shall be required to secure a permit pursuant to [SMARA] as long as the vested right continues and as long as no substantial changes are made in the operation except in accordance with [SMARA]." (Pub. Resources Code, § 2776, subd. (a).) However, assuming Hardesty has a vested right to conduct mining operations within the meaning of SMARA, the permit Hardesty is required to obtain from the District is not "a permit pursuant to [SMARA]." Hardesty has cited no authority standing for the proposition that the holder of a vested mining right is exempt from complying with California's air pollution laws. To the contrary, our Supreme Court has explained that a regional air quality management district may condition approval of a permit on compliance with a limit on emissions without violating a vested right of the applicant because companies have "no vested right to *pollute the air* at any particular level." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 323–324 [106 Cal.Rptr.3d 502, 226 P.3d 985], citing *Sherwin-Williams Co. v. South Coast Air Quality Management Dist., supra,* 86 Cal.App.4th at p. 1273; see *Mobil Oil, supra,* 59 Cal.App.3d at p. 305.)

The abatement order requiring Hardesty to obtain a permit from the District does not violate any vested right Hardesty might have to mine the property.

---

[4] The District also calculated the estimated emission level of the piles, both as they are formed and after formation. The emission level during formation was calculated to be 24.64 pounds per day. The emission level caused by wind erosion was calculated to be 6.3 pounds per day for active piles and 1.7 pounds per day for inactive piles.

## DISPOSITION

The judgment (order denying petition for writ of mandate) is affirmed. Costs on appeal are awarded to respondents. (Cal. Rules of Court, rule 8.278(a)(1).)

Blease, Acting P. J., and Robie, J., concurred.